1    SHAWN N. ANDERSON
     United States Attorney
2    STEPHEN F. LEON GUERRERO
     Assistant United States Attorney
3    MARIE L. MILLER
     Special Assistant United States Attorney
4    SAMANTHA R. MILLER
     Special Assistant United States Attorney
5    Sirena Plaza, Suite 500
     108 Hernan Cortez Avenue
6    Hagåtña, Guam 96910
     PHONE: (671) 472-7332
7    FAX: (671) 472-7215

8    Attorneys for the United States of America

9               IN THE UNITED STATES DISTRICT COURT

10                  FOR THE TERRITORY OF GUAM

11   UNITED STATES OF AMERICA,          CRIMINAL CASE NO. 18-00010

12              Plaintiff,

13              vs.                      **UNITED STATES' AMENDED TRIAL
                                         BRIEF**

14   JOHN D. WALKER,                     **Judge: Hon. Frances M. Tydingco-
        aka JON WALKER,                  Gatewood, Chief Judge**

15   MARVIN R. REED,
     KENNETH R. CROWE,                   **Trial: March 8, 2022**

16   PHILLIP T. KAPP,
     RANDALL ROGERS, and

17   HANSEN HELICOPTERS, INC.

18              Defendants.

19

20          COMES NOW, the United States of America, by and through undersigned counsel, and

21   respectfully submits this amended trial brief in accordance with the Court's Sixth Amended Trial

22   Scheduling Order (ECF No. 1036) and General Order 16-0002.

23

24

**TABLE OF CONTENTS**

I.   CASE POSTURE ........................................................................................................ 1

II.  BASIC FACTS ........................................................................................................... 1

  A.  The Defendants Fraudulently Purchased and Assembled Helicopters from Destroyed, Substantially Damaged, and Foreign Helicopters, Using Counterfeit Parts, Uncertificated Airmen, and Falsely Identifying such Helicopters as Legitimate with False Data Identification and Registration Information ........................................................................ 2

  B.  The Defendants Continued to Lie to the FAA About Helicopter Identities and Conditions in Order to Obtain and Maintain Registration and Airworthiness Certificates. ................. 6

  C.  The Defendants Hired Mechanics and Pilots Who Did Not Have FAA Certification to Operate FAA Registered Helicopters Because They Asked No Questions and Were Paid Less. .................................................................................................................................. 7

  D.  The Defendants Took Extraordinary, Deliberate Steps to Avoid Mandatory Inspection and Oversight ...................................................................................................................... 8

    1. The Defendants Bribed U.S. and International Aviation Safety Inspectors. ................. 8

    2. The Defendants Lied to the FAA and Others About the Status and Location of Their Aircraft. ....................................................................................................................... 9

  E.  The Defendants' Practice to Buy and Install Unapproved, Counterfeit Helicopter Parts Resulted in Serious and Fatal Helicopter Crashes ........................................................... 11

  F.  The Defendants Obstructed NTSB Accident Investigations. ........................................... 12

  G.  The Defendants Lied to Their Tuna Boat Clients About the Legitimacy, Airworthiness, and Regulatory Compliance of Their Helicopters. ........................................................... 13

  H.  The Defendants Laundered Money Made from Tuna Boat Contracts Through a Web of Shell Companies and On and Off-Shore Bank Accounts. ................................................ 13

III. CHARGES AND RELATED ISSUES .................................................................... 14

  A.  Conspiracy to Defraud the FAA and NTSB ................................................................... 14

  B.  Destruction, Alteration, or Falsification of Records ...................................................... 15

  C.  False Statement ............................................................................................................... 16

  D.  Aircraft Parts Fraud ....................................................................................................... 17

    1.  Count 8: Falsification or Concealment of a Material Fact ........................................ 17

    2.  Count 9: Materially Fraudulent Representation ........................................................ 18

    3.  Count 10: Conspiracy to Make or Use a Materially False Writing. .......................... 19

    4.  Count 11: Sale, Trade, or Installation of an Aircraft Part by Means of a Fraudulent Representation ........................................................................................................... 20

    5.  Count 12: Falsification or Concealment of a Material Fact ...................................... 20

    6.  Count 13: Sale, Trade, or Installation of an Aircraft Part by Means of a Fraudulent Representation ........................................................................................................... 21

    7.  Special Issues. ........................................................................................................... 21

      a.   Facts Relevant for Sentencing. ............................................................................ 21

      b.   As a Corporation, Hansen May Be Found Criminally Liable. ............................. 22

  E.  Aircraft Registration Violations .................................................................................... 23

United States' Amended Trial Brief                     i

1. Defendants Employed Scores of Uncertificated Mechanics and Pilots to Fix and Fly Hansen Helicopters. ........................................................................ 23

2. Defendants Displayed False Markings of Aircraft Nationality and/or Registration... 24

F. Conspiracy to Commit Wire Fraud ............................................................... 25

G. Wire Fraud ................................................................................................... 26

H. Money Laundering ........................................................................................ 27

I. Forfeiture Is a Matter for the Court ............................................................... 28

IV. ANTICIPATED EVIDENCE ............................................................................ 29

A. Witnesses ..................................................................................................... 29

1. Former and Current Hansen Employees. ................................................... 29

2. Other Fact Witnesses. ................................................................................. 36

3. Records Custodians. ................................................................................... 40

4. Federal Agents and Employees. ................................................................. 41

5. Expert Witnesses ........................................................................................ 43

B. Documents. ................................................................................................... 45

V. EVIDENTIARY AND OTHER TRIAL ISSUES ................................................... 46

A. Authentication .............................................................................................. 46

1. Generally. .................................................................................................... 46

2. Duplicates. .................................................................................................. 47

3. Foundation for Still Photographs/Video Recording .................................. 47

4. Evidence Obtained from Civil Aviation Authorities of New Zealand, Philippines, and Federated States of Micronesia via MLAT ....................................................... 48

B. Evidence "Inextricably Intertwined" With the Scheme to Defraud ................. 49

C. Defendants' Own Statements ........................................................................ 50

1. Admissions of a Defendant are Admissible When Offered by the Government but Defendants Cannot Introduce Their Own Hearsay Statements. ................................ 50

2. *Bruton* Does Not Bar Introduction of Defendants' Statements. ................ 50

D. Summary Exhibits. ....................................................................................... 51

E. Incriminating Evidence Outside the Statute of Limitations ........................... 52

F. Prior Rulings on Motions in *Limine.* ........................................................... 53

G. Presentation of Evidence .............................................................................. 53

H. Spousal and Marital Privileges. .................................................................... 53

I. International Law Governs Helicopters Operating Over the "High Seas." ....... 55

J. Statements of Non-Testifying Agents ............................................................ 58

K. Unrelated Instances of Non-Criminal Conduct ............................................. 58

L. Explanation of Investigation ......................................................................... 58

VI. Conclusion .................................................................................................... 59

# **TABLE OF AUTHORITIES**

**CASES**

*Crawford v. Washington,* 541 U.S. 36 (2004) ............................................................. 58

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)........................... 43

*Dennis v. United States*, 384 U.S. 855 (1966) ............................................................. 15

*Exec. 1801 LLC v. Eagle W. Ins. Co.*, No. 3:18-CV-00580-SB,

    2021 WL 5114665 (D. Or. June 11, 2021) ............................................................. 22

*Hammerschmidt v. United States*, 265 U.S. 182 (1924) ............................................... 15

*Kungys v. United States*, 485 U.S. 759 (1988) ............................................................. 16

*Libretti v. United States*, 516 U.S. 29 (1995) ............................................................... 28

*Neder v. United States*, 527 U.S. 1 (1999) ................................................................... 27

*New York Cent. & Hudson R.R. Co. v. United States,* 212 U.S. 481 (1909) ................. 22

*Phillips v. United States*, 356 F.2d 297 (9th Cir. 1965)................................................ 27

*Phiropoulous v. State*, 908 S.W. 3d 712 (Mo.App.E.D. 1995) .................................... 48

*Salinas v. United States*, 522 U.S. 52 (1997)................................................................ 26

*Smith v. United States*, 568 U.S. 106 (2013) ................................................................ 15

*Sudberry v. Arizona*, 463 F. App'x 629 (9th Cir. 2011) ............................................... 22

*Suthterland v. Koster*, No. 4:10CV1611MLM, 2011 WL 2784108 (E.D.Mo., 2011) ................ 48

*Trammel v. United States*, 445 U.S. 40 (1980) ............................................................. 54

*TRE Aviation Administration v. Federal Aviation Administration,*

    686 Fed. Appx. 487 (9th Cir. 2017)....................................................................... 4

*United States Parker*, 553 F.3d 1309 (10th Cir. 2009)................................................. 19

*United States v. Aleman*, 592 F.2d 881 (5th Cir. 1979) ................................................ 49

*United States v. Al-Imam*, No. 17-cr-00213 (CRC),

    2019 WL 2358365 (D.D.C. June 4, 2019) ............................................................ 49

*United States v. Andreadis*, 366 F.2d 423 (2d Cir 1966)............................................. 27

*United States v. Anekwu*, 695 F.3d 967 (9th Cir. 2012)................................................ 51

*United States v. Atkinson*, No. 99-30180, 99-30181,

    2000 WL 1015905 (9th Cir. July 21, 2000)........................................................... 23

*United States v. Aubrey*, 800 F.3d 1115, 1130 (9th Cir. 2015)..................................... 51

*United States v. Barela*, 973 F.2d 852 (10th Cir. 1992) ............................................... 59

*United States v. Barry*, 814 F.2d 1400 (9th Cir. 1987)......................................................58

*United States v. Berger,* 224 F.3d 107 (2d Cir. 2000) ....................................................15

*United States v. Beusch,* 596 F.2d 871 (9th Cir. 1979).....................................................22

*United States v. Black*, 767 F.2d 1334 (9th Cir. 1985) ....................................................46

*United States v. Bolzer*, 556 F.2d 948 (9th Cir. 1977)......................................................54

*United States v. Brannon*, 616 F.2d 413 (9th Cir. 1980) ................................................47

*United States v. Burkholder*, 816 F.3d 607 (10th Cir. 2016) ...........................................21

*United States v. Calabrese*, 825 F.2d 1342 (9th Cir. 1987)...............................................25

*United States v. Clark*, 986 F.2d 65 (4th Cir. 1993) ......................................................48

*United States v. Cromer*, 389 F.3d 662 (6th Cir. 2004).....................................................59

*United States v. Dess*, 34 F.3d 838 (9th Cir. 1994) ........................................................27

*United States v. F.J. Vollmer & Co., Inc.*, 1 F.3d 1511 (7th Cir. 1993) .............................17

*United States v. Fernandez*, 839 F.2d 639 (9th Cir. 1988) ...............................................50

*United States v. Gadson*, 763 F.3d 1189 (9th Cir. 2014)...................................................46

*United States v. Gaudin*, 515 U.S. 506 (1995).................................................................16

*United States v. Gay*, 967 F.2d 322 (9th Cir. 1992)..........................................................27

*United States v. Gil*, 58 F.3d 1414 (9th Cir. 1995) .........................................................58

*United States v. Gonzalez*, 906 F.3d 784 (9th Cir. 2018) ...............................................16

*United States v. Grimm*, 568 F.2d 1136 (5th Cir. 1978) ................................................58

*United States v. Hedgcorth*, 873 F.2d 1307 (9th Cir. 1989) ...........................................58

*United States v. Hilton Hotels,* 467 F. 2d 1000 (9th Cir. 1972),

  *cert denied*, 409 U.S. 1125, (Mem.) (1973)..................................................................22

*United States v. Hubbard*, 96 F.3d 1223 (9th Cir. 1996)...................................................25

*United States v. Jackson*, 33 F.3d 866 (7th Cir. 1994) ....................................................15

*United States v. Jones*, 425 F.2d 1048 (9th Cir. 1970) ....................................................27

*United States v. Liu*, 731 F.3d 982 (9th Cir. 2013)..........................................................14

*United States v. Lloyd*, 807 F.3d 1128 (9th Cir. 2015) ....................................................24

*United States v. Lowe*, 767 F.2d 1052 (4th Cir. 1985).......................................................59

*United States v. Marashi*, 913 F.2d 724 (9th Cir. 1990)..........................................54, 55

*United States v. Martin*, 897 F.2d 1368 (6th Cir. 1990) ................................................59

*United States v. Matlock*, 415 U.S. 164 (1974) ..............................................................50

United States' Amended Trial Brief

iv

*United States v. Monroe*, 552 F.2d 860 (9th Cir. 1997)..................................................26

*United States v. Moran*, 759 F.2d 777 (9th Cir. 1985) ...............................................15

*United States v. Musacchio*, 968 F.2d 782 (9th Cir. 1991)...........................................53

*United States v. Ortega*, 203 F.3d 675 (9th Cir. 2000)...............................................50

*United States v. Ortiz*, 776 F.3d 1042 (9th Cir. 2015)................................................47

*United States v. Osorio*, No. 88-5523, 1988 WL 83427 (4th Cir. July 26, 1988) ......................48

*United States v. Peterson*, 140 F.3d 819 (9th Cir. 1998)............................................51

*United States v. Peterson*, 538 F.3d 1064 (9th Cir. 2008) ..........................................16

*United States v. Qaoud*, 777 F.2d 1105 (6th Cir. 1985) .............................................58

*United States v. Rasheed*, 663 F.2d 843 (9th Cir. 1981)............................................27

*United States v. Reilly*, 33 F.3d 1396 (3d Cir. 1994)...............................................47

*United States v. Reyes*, 577 F.3d 1069 (9th Cir. 2009)..............................................24

*United States v. Ripinsky*, 129 F.3d 518, 1440 (9th Cir. 1997) ....................................49

*United States v. Rizk*, 660 F.3d 1125 (9th Cir. 2011) ..............................................51

*United States v. Roach*, 28 F.3d 729 (8th Cir. 1994)...............................................48

*United States v. Russell*, 703 F.2d 1243 (11th Cir. 1983)..........................................58

*United States v. Santillan*, 243 F.3d 1125 (9th Cir. 2001)..........................................14

*United States v. Sayakhom*, 186 F.3d 928 (9th Cir. 1999)...........................................49

*United States v. Shabani*, 513 U.S. 10 (1994) .....................................................26

*United States v. Smith*, 831 F.3d 1207 (9th Cir. 2016)..............................................16

*United States v. Soliman*, 813 F.2d 277 (9th Cir. 1987)............................................49

*United States v. Solorio*, 669 F.3d 943 (9th Cir. 2012) ...........................................58

*United States v. Standish*, 3 F.3d 1207 (8th Cir. 1993) ...........................................48

*United States v. Stewart*, 420 F.3d 1007 (9th Cir. 2005)...........................................47

*United States v. Strickland*, 935 F.2d 822 (7th Cir. 1991).........................................49

*United States v. Strobehn*, 421 F.3d 1017 (9th Cir. 2005).........................................55

*United States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000).........................................46

*United States v. Tarallo*, 380 F.3d 1174 (9th Cir. 2004) ..........................................24

*United States v. Tenerelli*, 614 F.3d 764 (8th Cir. 2010)..........................................59

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004).........................................47

*United States v. Turman*, 122 F.3d 1167 (9th Cir. 1997)...........................................14

United States' Amended Trial Brief

v

*United States v. Vizcarra-Martinez*, 66 F.3d 1006 (9th Cir. 1995) ............................................. 49

*United States v. Western Titanium, Inc.,* No. 08CR4229-JLS,

  2010 WL 4659646 (S.D.Cal. Oct. 15, 2010) ....................................................... 22

*United States v. White*, 974 F.2d 1135 (9th Cir. 1992) ........................................................... 54

*United States v. Woods*, 335 F.3d 993 (9th Cir. 2003) ........................................................... 27

*United States v. Woods*, 943 F.2d 1048 (9th Cir. 1991) ........................................................... 51

*United States v. Yermian*, 468 U.S. 63 (1984) ........................................................... 17

*United States v. Yin*, 935 F.2d 990, 996 (9th Cir. 1991) ........................................................... 46

*United States. v. Edwards*, 69 F.3d 419 (10th Cir. 1995) ........................................................... 19

*Unites States v. Vo*, 413 F.3d 1010 (9th Cir. 2005) ........................................................... 54, 55

*Whitfield v. United States*, 543 U.S. 209 (2005) ........................................................... 26

**STATUTES**

18 U.S.C. § 2 ........................................................................................................... 26

18 U.S.C. § 10 ................................................................................................... 18, 28

18 U.S.C. § 31(a)(2) ................................................................................................. 12

18 U.S.C. § 38 ............................................................................................... 19, 20, 21

18 U.S.C. § 1035 ..................................................................................................... 24

18 U.S.C. § 1349 ..................................................................................................... 26

18 U.S.C § 1365 ...................................................................................................... 12

18 U.S.C. § 1519 ................................................................................................. 15, 16

18 U.S.C. § 1957 ................................................................................................. 27, 28

18 U.S.C. § 3238 ..................................................................................................... 52

18 U.S.C. § 3505 ..................................................................................................... 48

49 U.S.C. § 40102 ................................................................................................... 23

49 U.S.C. § 46306(b) ......................................................................................... 23, 24

**OTHER AUTHORITIES**

*Developments in the Law -- Corporate Crime: Regulating Corporate Behavior Through*

  *Criminal Sanctions*, 92 Harv. L. Rev. 1227 (1979) ....................................................... 22

FAA Order 8100.19 ............................................................................................... 3, 4

ICAO Annex 2 ......................................................................................................... 56

ICAO Annex 7 ......................................................................................................... 56

United States' Amended Trial Brief

vi

Ninth Cir. Model Crim. Jury Instructions No. 5.7 .................................................................. 14

Ninth Cir. Model Crim. Jury Instructions No. 8.20 (2019 edition) .............................. 19, 25

Ninth Cir. Model Crim. Jury Instructions No. 8.21 (2020 Edition).................................. 15

Ninth Cir. Model Crim. Jury Instructions No. 8.73 (2021 edition) .................................. 17

Ninth Cir. Model Crim. Jury Instructions No. 8.110 .......................................................... 12

Ninth Cir. Model Crim. Jury Instructions No. 8.123A ...................................................... 28

Ninth Cir. Model Crim. Jury Instructions No. 8.124 (2021 edition) ................................ 26

Ninth Cir. Model Crim. Jury Instructions No. 8.131A (2021 Edition).............................. 16

Ninth Cir. Model Crim. Jury Instructions No. 8.150 (2021 edition) ................................ 28

*SUPs Program Plan*, FAA SUPs Task Force Report (Oct. 6, 1995)................................ 11

**RULES**

Fed. R. Crim. P. 32.2 ........................................................................................................... 28

Fed. R. Evid. 404(b) ........................................................................................................... 49

Fed. R. Evid. 501 ................................................................................................................ 54

Fed. R. Evid. 611(a) ........................................................................................................... 51

Fed. R. Evid. 702 ................................................................................................................ 43

Fed. R. Evid. 801 ................................................................................................................ 50

Fed. R. Evid. 803 ................................................................................................................ 58

Fed. R. Evid. 901 ................................................................................................................ 47

Fed. R. Evid. 901(a) ........................................................................................................... 46

Fed. R. Crim. P. 611(a) ...................................................................................................... 53

Fed. R. Evid. 902(11) ......................................................................................................... 48

Fed. R. Evid. § 1001(2) ...................................................................................................... 48

Fed. R. Evid. 1006 .............................................................................................................. 51

**REGULATIONS**

14 C.F.R. § 21.335 .............................................................................................................. 25

14 C.F.R. § 27.602 .............................................................................................................. 11

14 C.F.R. § 29.602 .............................................................................................................. 11

14 C.F.R. § 45.13 .................................................................................................................. 4

14 C.F.R. § 45.23 ................................................................................................................ 24

14 C.F.R. § 45.33 ................................................................................................................ 25

United States' Amended Trial Brief

14 C.F.R. § 47.41 ................................................................................................................. 3

14 C.F.R. Part 61 ............................................................................................................... 23

14 C.F.R. Part 65 ............................................................................................................... 23

49 C.F.R. § 830.5 .............................................................................................................. 12

United States' Amended Trial Brief

## I. CASE POSTURE

On May 30, 2018, a grand jury returned an indictment against defendants John D. Walker, Marvin R. Reed, Kenneth R. Crowe, Phillip T. Kapp, Randall Rogers, and Hansen Helicopters, Inc. ("Hansen"), charging these persons and entities with twenty-three counts, including criminal conspiracy, money laundering, falsification offenses, and several types of fraud. ECF No. 1.

On December 12, 2019, a grand jury returned a superseding indictment ("SI"), charging these defendants with eighty-one total counts, including additional conspiracies, aircraft parts fraud, bribery, and a number of criminal aircraft registration violations, such as employing a mechanic without a Federal Aviation Administration ("FAA") certificate. ECF No. 369.

On January 8, 2021, a grand jury returned a second superseding indictment ("SSI"), charging the same defendants with 110 counts, including additional criminal aircraft registration violations; the SSI also added two additional defendants, Spares, Inc. ("Spares") and its owner, Frank Litkei ("Litkei") (ECF No. 862); however, in July 2021, Litkei died and the Court dismissed all charges against him. ECF No. 1009. Counsel for Litkei and Spares represented that Litkei was sole shareholder of Spares and, as such, the status of Spares' solvency and operations remain unclear in the wake of Litkei's death. *See* ECF No. 1198. As a result, the government agreed to sever Spares to ascertain the viability of it as a criminal defendant without delaying the case.

The United States voluntarily dismissed count 76 (employing a mechanic without an FAA certificate) and the Court dismissed count 98 (bribery). On January 7, 2022, this Court ordered the trials of defendants Rogers and Reed severed from the trial against defendants Walker, Crowe, Kapp, and Hansen. ECF No. 1239. Since Rogers and Reed are not solely named in any one count, their severance does not materially impact the issues for trial, scheduled to commence March 7.

## II. BASIC FACTS

Beginning as early as 1992 and continuing through the present, the defendants named in

the indictments engaged in a comprehensive scheme to defraud the government as to the safety and regulatory compliance of their helicopters. Each of the over 100 criminal counts arise directly from this over-arching scheme to defraud.

**A. The Defendants Fraudulently Purchased and Assembled Helicopters from Destroyed, Substantially Damaged, and Foreign Helicopters, Using Counterfeit Parts, Uncertificated Airmen, and Falsely Identifying such Helicopters as Legitimate with False Data Identification and Registration Information**.

The defendants accomplished their conspiracy to defraud the FAA and National Transportation Safety Board ("NTSB") through the following:

(a)    buying previously destroyed, scrapped, or otherwise deemed un-airworthy helicopters to use as purported legitimate civil aircraft for profit, despite failing to properly repair those aircraft;

(b)    falsifying or concealing material facts related to those helicopters to avoid detection by the FAA and NTSB;

(c)    making materially fraudulent statements to the FAA to obtain U.S. registrations and Airworthiness Certificates;

(d)    refusing and avoiding inspections of the FAA registered helicopters;

(e)    deregistering then re-registering aircraft with the FAA and other civil aviation authorities, including the Philippine and New Zealand Aviation authorities, to avoid inspection, oversight, and detection of fraud;

(f)    operating aircraft that were not registered in any jurisdiction.

(g)    switching data plates from their associated aircraft or aircraft parts to non-associated aircraft or aircraft parts;

(h)    hiring uncertified mechanics and pilots to work on and operate the aircraft, thereby exacerbating the unsafe operation of damaged helicopters;

United States' Amended Trial Brief

2

1    (i)    manufacturing, shipping, purchasing, and utilizing counterfeit parts;

2    (j)    concealing accidents and incidents from the NTSB and FAA;

3    (k)    bribing a FAA inspector;

4    (l)    bribing inspectors from a foreign aviation authority;

5    (m)    taking other measures to conceal material information from the government
6    (including tampering with N number markings on the helicopters);

7    (n)    using shell companies to conceal the true fraudulent actors in the scheme and to
8    avoid criminal culpability; and

9    (o)    taking other measures to avoid detection and criminal liability through delaying
10   proceedings related to the availability of helicopters subject to the indictment to be inspected.

11         Defendants' scheme included illegally rebuilding helicopters by replacing all primary
12   structures — using counterfeit and cannibalized parts — and placing false identification (a.k.a.
13   "data plates") and registration information (a.k.a. "tail numbers") on them.  The scheme continued
14   as defendants presented false paperwork to the FAA, bribed a FAA safety inspector for false
15   airworthiness certificates, used uncertificated pilots and mechanics to operate these unsafe
16   helicopters - a dangerous and illegal practice linked to nine deaths, 16 serious bodily injuries, and
17   dozens of accidents of which the government is aware, as the defendants concealed numerous
18   additional accidents.

19         A helicopter is "totally destroyed or scrapped" when the aircraft's primary structure is so
20   damaged it would be impracticable to return the aircraft to an airworthy condition.  *See* 14 C.F.R.
21   § 47.41(a)(2); FAA Order 8100.19, Ch. 4, 2-3. The FAA is clear that a helicopter is only eligible
22   for repair if it maintains at least one primary structure. *See* FAA Order 8100.19, Ch. 4, 3.b.
23   Importantly, replacement of all primary structures of the aircraft is not a repair but a rebuild, and
24   only a manufacturer may rebuild a helicopter.

United States' Amended Trial Brief

3

Additionally, because helicopters are aircraft, it is imperative the helicopter itself, and every part used on it, are traceable. Every repair and replacement of parts must be recorded in a maintenance log. Further, all helicopters have unique identification numbers, just like cars have unique vehicle identification numbers. All helicopters have registration numbers, just like all cars have license plates. The helicopter identification number is associated with its registration number so its owner is known, just as a car's VIN number is associated with its license plate to identify its owner. Taking a data identification plate from the original helicopter, or the registration number assigned to the particular helicopter, and placing these unique identifiers on another helicopter is strictly prohibited by law. 14 C.F.R. § 45.13(e). FAA Order 8100.19, Chapter 4, 3.c.

Defendants and their lawyers know this: in the *TRE Aviation Administration v. Federal Aviation Administration,* 686 Fed. Appx. 487 (9th Cir. 2017), case, attorney Edward A. McConwell, employing David E. Cann as an expert, unsuccessfully argued his client merely repaired an aircraft. The FAA Administrator, Administrative Law Judge, NTSB Board, and ultimately the Ninth Circuit all agreed "the work performed on the helicopter cannot be characterized as maintenance…or repair," rejecting McConwell's argument and Cann's opinions. Yet McConwell used the same expert to make the identical argument here. For the same reasons, these arguments necessarily fail.

The evidence of defendants' intentional fraud on the FAA and NTSB is overwhelming, and includes multiple admissions by the defendants, such as:

- (illegally rebuilding helicopters) "We're only having Randy rebuild enough airframes so we can have them wired up and have on hand so when airframes come in that are too badly corroded to turn around quickly, we can swap the components and turn the machine around quickly" email from Crowe to Walker copying Kapp (G-0148);

- (illegally switching registration numbers) "Another thought on having a bunch of fuselages around your shop with no numbers. …we can slap Philippine #'s on them," email from Kapp to Rogers (G-0315, G-0676, G-0933);

United States' Amended Trial Brief

4

- (falsifying repair paperwork) "Also, do you need a 337 [repair record] on [N]500LA. I can do one for 1985, as 9183F if I knew where the aircraft was at that date. What are some others you need?" email from Rogers to Kapp (G-0671);

- (buying destroyed helicopters with no intention of properly repairing) "I know the donkeys didn't take pics of the smashed side…and it hasn't made it onto the MD's hit list of 'suspected destroyed aircraft,'" email from Kapp to Rogers (G-0319, G0434, G-0940);

- (falsifying bills of sale) "if you need a BOS let me know," email between Rogers and Kapp (G-0315, G0676, G-0933);

- (Vanuatu companies shell corporations) "All of the companies are owned by Jon…," Crowe to potential purchaser of company (G-0302, G-0928, G-1476);

- (Intent to defraud the FAA) "[The New Zealand] registration was to circumvent the FAA," Crowe to potential purchaser of company (G-0302-2, G-0928-2, G-1476-2).

There are substantially more admissions as well as other direct and indirect evidence of guilt.

The intentional and insidious effect of defendants' fraud was to exacerbate the risk of accident, injury, and death of persons in or within the vicinity of these "Frankenstein" helicopters. It also resulted in the inability of the FAA and NTSB to perform its critical mission – the assurance of aviation safety. Defendants made accountability related to the safe operation of the helicopters, the proper maintenance of the helicopters, and the traceability of critical helicopter parts impossible. Why? The oldest motivation in the world - a greedy desire to put as much of the in excess of $21million per year for leasing these machines in their pockets.

The helicopter known as N243D is one of many blatant and egregious examples of defendants' *modus operandi*. James G. Marson originally owned N243D. He testified (during a Fed.R.Cr.R.15 deposition) that N243D was totally destroyed in a serious crash in which Mr. Marson sustained severe injuries in 2004. Following his crash, Marson sold N243D as scrap to a third party associate of defendant Rogers. In 2007, before defendants acquired the scrapped N243D from a third party, they started using its registration number on another aircraft. Then in 2011, defendants bought the scrap that was N243D and its paperwork from a dealer. Defendants then

United States' Amended Trial Brief

5

forged Marson's signature on the bill of sale, misrepresenting to the FAA that: (a) the aircraft was "erroneously reported as destroyed" and (b) that they purchased N243D and all of its maintenance records directly from Marson. Defendants falsely claimed they "repaired" N243D, but the government can prove beyond any reasonable doubt that at one particular point in time there were *at least three different helicopters with the registration number N243D* and the correlating data identification plate.

**B. The Defendants Continued to Lie to the FAA About Helicopter Identities and Conditions in Order to Obtain and Maintain Registration and Airworthiness Certificates.**

The defendants continued their lies to the FAA with respect to the identities and conditions of helicopters in order to obtain FAA certificates necessary to fly those aircraft. For example, Crowe *regularly* forged bill of sale records submitted to the FAA when registering helicopters. Indeed, in a 2014 email, defendant Crowe sent defendant Walker a blank bill of sale to sign, stating that in order to register aircraft N1156X, they were "going to need a bill of sale from J&P Apparel to Plymouth Copters Inc. to BRAVO AIR INC." (G-0842-1).

Similarly, defendants routinely represented to the FAA that original copies of airworthiness certificates had been "lost at sea" in order to obtain duplicates, which the defendants then used illegally – operating a veritable helicopter "chop shop." For example, following a fatal crash in 2015, Crowe directed Hansen employees to notarize documents claiming that helicopter with the registration number N9068F crashed at sea along with its original registration and airworthiness certificates. In fact, the defendants were in possession of both the registration and airworthiness certificates when the government exercised its search and seizure of defendants' premises.

The defendants not only lied to obtain certificates, they also lied to the FAA to retain them. Defendants regularly made false misrepresentations in entries, certifications, documents, and records submitted to the FAA. For example, countless emails reveal that defendants made false

United States' Amended Trial Brief

6

logbook entries, made false entries on maintenance and repair forms, and took other measures to conceal the background, maintenance histories, and airworthiness of their helicopters.  In fact, Hansen Helicopters did not require pilots or mechanics to enter maintenance information in logbooks at all; instead, only the defendants had access to the limited "logbooks."  For example:

- On June 24, 2012: Kapp created a maintenance logbook entry for N243d indicating completion of a hard landing inspection[1]. (G-0822-24, G-1606, G-0820, G-1533-87, G-1533-107, G-0821, G-1599-13, G-0827-6, G-1651-2, G-0250-13, G-0253-11, G-1569-5). No such inspection was ever actually performed.

- On November 29, 2015, Kapp emailed Rogers stating that he was "filling out the 337 for this previous repair…It's been over 10 years since this aircraft …was damaged in an accident. At some point in time it got sent off for repair and the paperwork never caught up to it." Rogers responded by brainstorming ways in which they could falsify a paper trail for that aircraft, despite the required knowledge to do so. (G-0671).

- On December 4, 2015, Reed emailed Kapp, describing false information he intended to put on FAA Form 337 concerning N910WC: "910WC will be here Saturday morning, I will start an undated 337 on it ASAP. I need the owner, or should I use Steve's company? Do you have logs and data plate or are they still on it. I believe we can clean this all up this year and make your life so you can have sex without thinking about the FAA ☹ ☹." (G-0315, G-0676, G-0933).

## C. The Defendants Hired Mechanics and Pilots Who Did Not Have FAA Certification to Operate FAA Registered Helicopters Because They Asked No Questions and Were Paid Less.

Defendants intentionally hired foreign pilots and mechanics who had no FAA certifications, because those pilots and mechanics, paid significantly less, asked no questions. Defendants' business records reflect the hiring of uncertificated pilots and mechanics "[b]etween on or about 1998 to present," knowing they lacked the required certification to operate FAA registered helicopters.  Defendants required their uncertified pilots and mechanics to sign contracts with one of their many shell companies, and then had them sign *second* contracts indicating they were certificated even though they were not.

---

[1] A "hard landing" occurs when the aircraft/helicopter lands damaging its components and rendering them non-airworthy, which, in turn, makes the aircraft/helicopter unsafe to operate and fly.

United States' Amended Trial Brief

7

Defendants' emails confirm they knew their hiring practices were illegal. For example, in March 2013, Reed received an email summarizing a meeting he had with a FAA representative:

> The FAA rep. for Majuro . . . brought up a point that Tom Bustos only has a Philippine pilot lic. And the fact he was piloting a US reg. aircraft. His only concern was if the accident was to happen within Majuros (any) jurisdiction this would be a major problem. (G-0618).

Further, the testimony of another pilot, Mr. Marinho, demonstrates the defendants' knowledge of his lack of FAA certification, the requirement to execute two contracts, one admitting he was not certificated, and another to show misrepresent he was FAA certificated, and the operation of three different FAA registered helicopters despite the fact such was illegal. (G-0318, G-1058, G-0976, G-1798, G-1122, G-1102, G-1123, G-0348, G-0959).

**D.  The Defendants Took Extraordinary, Deliberate Steps to Avoid Mandatory Inspection and Oversight**

1.  <u>The Defendants Bribed U.S. and International Aviation Safety Inspectors</u>.

Timothy Cislo was the FAA aviation safety inspector responsible for overseeing defendants. Over several years, the defendants bribed Cislo to neglect his duties and rubberstamp—without any inspection or diligence——the FAA airworthiness certificates the defendants needed to continue operating. Defendants offered Cislo a number of "gifts" ranging from lunch to airplane rides, to "money and hookers," culminating in the delivery of a $20,000 yellow Taylorcraft airplane to Cislo in June 2014. After receiving the airplane, Cislo sent an email to defendants stating he had "a sign-fest" of airworthiness certificates, despite that he did not inspect all of those aircraft and "did not look through 100% of the aircraft records" for the certificate renewals. (G-0282-4, G-1868-4).

Cislo will testify to the bribe in exchange for his actions, and that he "coached" the defendants on their false logbook entries. Indeed, their "lost at sea" guise to obtain replacements

certificates was on Cislo's recommendation. Cislo further instructed the defendants to place forged logbook entries on stickers so that Cislo could later fraudulently insert the entries into the aircraft logbook pages, which would be "probably be more believable." After being confronted with these criminal acts, on March 28, 2018, Cislo pled guilty to three felony fraud counts.

In addition to bribing Cislo, the defendants' email traffic reveals they also regularly bribed foreign safety inspectors. For example, Crowe emailed Reed in July 2013 (G-0420):

> I forgot to ask you about the flipping Filipinos. Do you want me to arrange for the airworthiness guys to come out-or are we going to trigger the nigger? Oh, and we hired a nigger, Scott's son-in-law…it's been hilarious! I don't have a problem with it as long as Harry does all the paperwork and leaps through the flaming hoops. I'm done leaping through hoops for the fucking flips. If it were up to me we'd send data plates and N-Numbers to the RPC's and a $2K bonus to the pilots and mechanics to keep their mouths shut!

Later that afternoon, Crowe wrote as follows to a different Hansen employee, Miguel Lero (a.k.a Harry) (G-0377, G-0981):

> Harry: Do these guys want to do a real inspection or do they just want the cash? I, personally, am not jumping through anymore flaming hoops for these lying, stealing fuckheads. If we bring them out here, you get to appease them and do the paperwork – I'm not doing it again. I have enough US registrations to change the entire flipping Filipino fleet back to US and I have recommended to Jon that we should do just that because we can truck anyone the entire flipping Philippines anymore.

2. The Defendants Lied to the FAA and Others About the Status and Location of Their Aircraft.

In addition to bribing safety inspectors, the defendants also avoided mandatory inspections by lying to FAA inspectors about the status and location of their aircraft. Defendants lied by saying helicopters were at sea when they were not, and defendants did not have their helicopters fly into Guam when they knew FAA inspectors were present. Defendants instructed pilots, mechanics, and tuna boat crewmembers to hide or otherwise conceal or delay the offloading of Hansen aircraft. The jury will see evidence of repeated false representations to the FAA that the helicopters were

United States' Amended Trial Brief

9

exported, when in fact they were never exported out of the United States.

Defendants also used proceedings in a foreign court to delay inspection. *See* ECF Nos. 536, 542, 1127 & 1127-5, 1128, 1133. A Federated States of Micronesia (FSM) court found that Dave's Helicopters—one of defendants' shell companies—delayed and prevented one of defendants' crashed helicopters from being shipped to the United States for use as evidence in this trial (by requesting a stay pending appeal of an already failed attempt to do so):

> Walker, the true real party in interest, will, of course, be able to contest whether a serious offense was committed against the laws of a foreign state – the U.S. – in the courts of that foreign state and argue there about whether the helicopter is evidence of the commission of that alleged serious offense.
>
> Dave's purported concerns about its helicopter's fate on Guam and whether it will ever get its helicopter back are misplaced. Dave's cannot show any irreparable harm.
>
> . . .
>
> At best, Dave's assertion, that it would take the FSM appellate court only "a few months" from the start of the appeal to conclude its proceedings in the matter, is overly, if not exceedingly, optimistic or outright misleading. Those "few months" are already almost gone. The court can only note that the major reason, if not the sole reason, for Dave's to seek a stay or injunction appears to be delay - which is an improper purpose. Dave's has delayed matters at every opportunity.
>
> . . .
>
> Although delay may not be particularly in Dave's interest, it is definitely in the best interest of Dave's principal - Walker, the true real party in interest - to delay the helicopter's shipment to Guam until after Walker's criminal trial is over.

*See* ECF No. 1127-5 (Order Denying Injunction or Stay, *In the Matter of the Search and Seizure of Wrecked/Damaged Helicopter v. Dave's Helicopter Service, Inc.*, Search Warrant No. 2019-700 (FSM Supreme Court, Trial Division, Pohnpei)). Defendants' willingness to mislead courts and judges is in line with its blatant deception tactics with regulatory authorities, both U.S. and foreign.

//

United States' Amended Trial Brief

10

### E. The Defendants' Practice to Buy and Install Unapproved, Counterfeit Helicopter Parts Resulted in Serious and Fatal Helicopter Crashes

One of the most significant and dangerous aspects of the defendants' scheme involved the installation of counterfeit parts on their helicopters. Counterfeit aircraft parts, often referred to in the industry as "Suspected Unapproved Parts" (SUPs), are created when an individual or entity—without FAA parts manufacturing approval—deliberately misrepresents that its manufactured parts were designed and produced under an FAA-approved system or method. *See SUPs Program Plan*, FAA SUPs Task Force Report (Oct. 6, 1995).

Of particular concern was defendants' use of unapproved and counterfeit Tail Rotor Pitch Change Links (TRPCLs). TRPCLs are a "critical" aircraft part, "the failure of which could have a catastrophic effect upon the rotorcraft." 14 C.F.R. § 27.602 (critical parts for normal category rotorcraft); 14 C.F.R. § 29.602 (critical parts for transport category rotorcraft). Defendants bought counterfeit, unapproved TRPCLs from Spares; installed those counterfeit TRPCLs on their helicopters, and misrepresented on internal documents, invoices, and purchase orders that those parts were legitimate part "369A1807-9F".

Indeed, defendants' records show that they never purchased legitimate 369A1807-9F TRPCLs from an industry-approved parts manufacturer. Defendants' employees were directed by the defendants to buy and install counterfeit, unapproved parts on helicopters for the purpose of reducing costs, knowing those parts could not be verified as safe. Pilots and mechanics were required to "jerry-rig" the TRPCLs themselves, despite no training, experience, or certification in aircraft maintenance and the unacceptable safety risks associated with such practices. These practices included placing foreign material through the bearing holes in the TRPCL to maintain the needed friction, a practice even the defendants' own expert found appalling.

//

United States' Amended Trial Brief

Furthermore, government experts and the original equipment manufacturer all confirm the TRPCLs are counterfeit. These parts were painted black to mimic the coating of an approved part, while in fact lacking the epoxy top coat necessary to protect the part from corrosion. The bearings, necessary for the safe operation of the TRPCL, were repeatedly improperly installed. The counterfeit TRPCLs lack individualized serial numbers, date of manufacture, identification of manufacturer, and were packaged and shipped in batches (rather than individually), in violation of applicable packing and shipping safety standards.

Post-installation images of counterfeit TRPLs show visible damage and degradation, and that the TRPCLs were attached to other rotor parts with zip ties and/or pieces of cloth fabric. When a TRPCL fails, a helicopter loses autorotation control, begins to spin in circles, which almost inevitably results in a crash. TRPCL failure is consistent with a number of the documented Hansen Helicopter crashes, including those where Hansen pilots were injured and killed. The government's accident reconstruction expert will testify that a number of accidents, injuries and death were proximately[2] caused by this counterfeit part. This was one of many counterfeit parts purchased and used by defendants.

### F. The Defendants Obstructed NTSB Accident Investigations.

Defendants failed to report helicopter crashes to the NTSB, as is required by federal law. 49 C.F.R. § 830.5 ("The operator of any civil aircraft…shall *immediately* and by the most expeditious means available, notify the nearest [NTSB] office"). For example, Hansen helicopter N501SU crashed in May 2018. Defendants instructed their pilot to prevent others from taking photos or documenting the crashed helicopter, and the pilot altered the crashed helicopter and

---

[2] A proximate cause is one that played a substantial part in bringing about the malfunction or failure, so that the malfunction or failure was the direct result of a reasonably probable consequence.
**Source**: 18 U.S.C. § 38; 18 U.S.C. § 31(a)(2) and (7); 18 U.S.C § 1365(h)(4). Ninth Cir. Model Crim. Jury Instructions No. 8.110.

United States' Amended Trial Brief

12

removed its blades.

Similarly, defendants attempted to cover up details surrounding the crash of helicopter N805LA. Crowe instructed the pilot of N805LA, who sustained injuries in the crash, to let the helicopter sink into the ocean. Even though the defendants did report this particular accident to the NTSB, they falsely reported that the pilot did not sustain any injuries.

### G. The Defendants Lied to Their Tuna Boat Clients About the Legitimacy, Airworthiness, and Regulatory Compliance of Their Helicopters.

Defendants lied to tuna boat lessees about the airworthiness and regulatory compliance of helicopters leased from them. They misrepresented to tuna boat companies that the helicopters were legitimately registered with the FAA, airworthy, and that the pilots and mechanics were FAA certificated. FAA registered helicopters, and certificated pilots and mechanics, commanded higher prices due to the reputational benefits and assurances of safety associated with FAA oversight.

### H. The Defendants Laundered Money Made from Tuna Boat Contracts Through a Web of Shell Companies and On and Off-Shore Bank Accounts.

The proceeds of defendants' unlawful scheme were laundered using shell companies and various on- and off-shore bank accounts. Defendants' internal accounting documents and bank statements demonstrate defendants created more than forty shell companies for the purposes of avoiding taxes and insurance premiums, and to conceal their illegal proceeds. Each of the shell companies was owned and controlled by defendants. For example, in response to a question about the relationship between Wilma's Flight Services and Hansen, Crowe wrote as follows:

> It is all Hansen Helicopters: all of the aircraft are owned wholly by Hansen and it's [sic] subsidiary companies and all leases/contracts are basically with Hansen, Jon and [unknown individual] were trying to spread out the liability through the forming of the other companies. Everything is controlled by Hansen/Jon, they are synonymous. (G-0302-2, G-0928-2, G-1476-2).

Indeed, defendants' records show that the money garnered from tuna boat leases was

United States' Amended Trial Brief

13

funneled into accounts controlled by defendants; specifically, six electronic wire transactions, among many others, were performed involving criminally derived property of a value greater $10,000 in December of 2016, among many others. *See, e.g.,* ECF No. 862 ¶ 139. The IRS special agent and expert forensic accountant will attribute in excess of $400 million to the fraud, and show how the funds wend their way through various shells to defendants.

## III. CHARGES AND RELATED ISSUES

### A. Conspiracy to Defraud the FAA and NTSB

Count One[3] charges all defendants with engaging in a conspiracy to defraud the United States under 18 U.S.C. § 371. The government must prove the following elements beyond a reasonable doubt:

(1) Between 1992 and the present, there was an agreement between two or more persons to defraud the United States by obstructing the lawful functions of the FAA and/or NTSB by deceitful or dishonest means;

(2) The defendants became a member of the conspiracy knowing[4] of at least one of its objects and intending to help accomplish it; and

(3) One of the members of the conspiracy performed at least one overt act on or after 1992 for the purpose of carrying out the conspiracy.

---

[3] Unless otherwise stated, all references to "counts" are to those found in the Second Superseding Indictment.

[4] An act is done knowingly if the defendant is aware of the act and does not [act] [fail to act] through ignorance, mistake, or accident. [The government is not required to prove that the defendant knew that [his] [her] acts or omissions were unlawful.] You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly. Ninth Cir. Model Crim. Jury Instructions No. 5.7. Comment: The second sentence of this instruction should not be given when an element of the offense requires the government to prove that the defendant knew that what the defendant did was unlawful. *See United States v. Liu*, 731 F.3d 982, 994-95 (9th Cir. 2013) (criminal copyright infringement); *United States v. Santillan*, 243 F.3d 1125, 1129 (9th Cir. 2001) (violation of Lacey Act); *United States v. Turman*, 122 F.3d 1167, 1169 (9th Cir. 1997) (money laundering case).

United States' Amended Trial Brief

14

Ninth Cir. Model Crim. Jury Instructions No. 8.21 (2020 Edition); *Smith v. United States*, 568 U.S. 106, 111 (2013).

The statute applies to "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of Government," including the FAA and the NTSB. *See United States v. Jerkins*, 871 F.2d 598, 602 (6th Cir. 1989) (quoting *Dennis v. United States*, 384 U.S. 855, 861 (1966)). Thus, it is a violation of 18 U.S.C. § 371 to conspire to defraud by taking actions that impede, impair, obstruct, or defeat enforcement by the FAA and/or the NTSB of aviation laws. *See United States v. Moran*, 759 F.2d 777, 785 (9th Cir. 1985) ; *see also United States v. Berger,* 224 F.3d 107, 114-15 (2d Cir. 2000) (finding the defendants participated in a single conspiracy to defraud various federal agencies through diverse fraudulent acts).

The government need not charge or prove that a defendant agreed to commit or actually did commit a substantive offense. *United States v. Jackson*, 33 F.3d 866, 871 (7th Cir. 1994). The conspiracies prosecuted under this section include acts against the United States that "interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924); *United States v. Caldwell*, 989 F.2d 1056 (9th Cir. 1993).

**B. Destruction, Alteration, or Falsification of Records**

Counts 2-4 charge defendant Crowe, and Count 5 charges defendant Kapp, with unlawful destruction, alteration, or falsification of records under 18 U.S.C. § 1519. To prove unlawful destruction, alteration, or falsification of records, the government must prove the following elements beyond a reasonable doubt:

(1) The defendant knowingly altered, destroyed, concealed or falsified a record, document or tangible object; and

(2) The defendant acted with the intent to impede, obstruct or influence an actual or

United States' Amended Trial Brief

15

contemplated investigation of a matter within the jurisdiction of any department or agency of the United States.

Ninth Cir. Model Crim. Jury Instructions No. 8.131A (2021 Edition).

The government need not prove that the defendant's sole or even primary intention was to obstruct or influence an actual or contemplated investigation, as long as the government proves beyond a reasonable doubt that one of the defendant's intentions was to do so; an intention that must be substantial. *See United States v. Smith*, 831 F.3d 1207, 1218 (9th Cir. 2016). To sustain a conviction under § 1519, it is enough for the government to prove that the defendant intended to obstruct the investigation; the defendant need not know that the matter in question falls within the jurisdiction of a federal department or agency. *United States v. Gonzalez*, 906 F.3d 784, 794 (9th Cir. 2018).

**C. False Statement**

Counts 6 and 7 charge defendant Crowe with making a false statement in violation of 18 U.S.C. § 1001. To prove false statement, the government must prove the following elements beyond a reasonable doubt:

(1) The defendant made a false statement or used a writing that contained a false statement;

(2) The false statement or writing was made in a matter within the jurisdiction of the FAA;

(3) The defendant acted willfully; that is, the defendant acted deliberately and with knowledge that both the statement or writing was untrue and that his conduct was unlawful; and

(4) The statement or writing was material[5] to the activities or decisions of the FAA; that

---

[5] *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008): "[W]hether the statement 'has a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body to which it was addressed.'" (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988) and citing *United States v. Gaudin*, 515 U.S. 506, 509 (1995) as "reaffirm[ing]" *Kungys*).

United States' Amended Trial Brief

16

is, it had a natural tendency to influence, or was capable of influencing, the agency's decisions or activities.

*See* Ninth Cir. Model Crim. Jury Instructions No. 8.73 (2021 edition). The initial determination as to whether the matter is one within the jurisdiction of a department or agency of the United States—apart from the issue of materiality—should be made by the court as a matter of law. *United States v. F.J. Vollmer & Co., Inc.*, 1 F.3d 1511, 1518 (7th Cir. 1993).

In addition, no mental state is required with respect to the fact that a matter is within the jurisdiction of a federal agency. *United States v. Green*, 745 F.2d 1205, 1208-10 (9th Cir. 1984). Furthermore, the false statement need not be made directly to the government agency. *Id.* Finally, the defendant need not have acted with the intention of influencing the government agency. *United States v. Yermian*, 468 U.S. 63, 73 & n.13 (1984).

### D. Aircraft Parts Fraud

Counts 8-11 charge the defendants Walker, Reed, Crowe, Hansen, Spares and Kapp with distinct aircraft parts frauds under 18 U.S.C. § 38. *See* ECF No. 862 (US Bill of Particulars as to Counts 8-10). Counts 12-13 charge Hansen and Spares, with additional aircraft parts frauds under 18 U.S.C. § 38. *See* ECF No. 1061.

#### 1. Count 8: Falsification or Concealment of a Material Fact.

Count 8 charges defendants Walker, Reed (severed), Crowe, Kapp, Hansen, and Spares with falsification or concealment of a material fact concerning an aircraft part under 18 U.S.C. § 38(a)(1)(A). To prove falsification or concealment, the government must prove the following elements beyond a reasonable doubt:

(1) The defendant falsified or concealed a fact concerning an aircraft part;

(2) The fact was material;

(3) The defendant acted knowingly and with the intent to defraud;

United States' Amended Trial Brief

17

(4) The defendant's action was in or affected interstate or foreign commerce[6].

18 U.S.C. § 38(a)(1)(A).

As specified in the government's Bill of Particulars (ECF No. 1061), on or about October 5, 2015, defendants Walker, Crowe, Kapp, Reed, and Hansen ordered counterfeit aircraft parts from Spares that included, but were not limited to, counterfeit tail rotor pitch change links (TRPCLs), falsely identified as legitimate part number 369A1807-9F. Spares shipped those counterfeit parts, falsely stating that they were legitimate TRPCLs; and defendants Walker, Reed, Crowe, Kapp, and Hansen, knowing that the parts were counterfeit, falsely placed legitimate part number 369A1807-9F3 on internal company records, letters, and other writings.

2. Count 9: Materially Fraudulent Representation.

Count 9 charges defendants Walker, Reed, Crowe, Kapp, Hansen, and Spares with making a materially fraudulent representation concerning an aircraft part under 18 U.S.C. § 38(a)(1)(B). To prove a materially fraudulent representation, the government must prove the following elements beyond a reasonable doubt:

(1) The defendant made a fraudulent representation concerning an aircraft part;

(2) The representation was material;

(3) The defendant acted knowingly and with the intent to defraud;

(4) The defendant's action was in or affected interstate or foreign commerce.

18 U.S.C. § 38(a)(1)(B).

As specified in the government's Bill of Particulars (ECF No. 1061), on or about August 24, 2016, defendants Walker, Reed, Crowe, Kapp, and Hansen ordered counterfeit aircraft parts

---

[6] The term "foreign commerce", as used in this title, includes commerce with a foreign country. 18 U.S.C. § 10.

United States' Amended Trial Brief

18

from Spares, which included but were not limited to, counterfeit TRPCLs falsely identified as part number 369A1807-9F. Knowing that the counterfeit TRPCLs were manufactured without FAA approval, Spares nonetheless shipped the counterfeit parts and fraudulently represented on invoices, letters, packaging, and other papers that the counterfeit TRPCLs constituted FAA-compliant part number 369A1807-9F. Knowing that TRPCLs were counterfeit, defendants Walker, Reed, Crowe, Kapp, and Hansen fraudulently represented that the TRPCLs were legitimate aircraft parts by placing the part number 369A1807-9F on internal company records, letters, packaging, communications, and other papers.

### 3. Count 10: Conspiracy to Make or Use a Materially False Writing.

Count 10 charges Walker, Reed, Crowe, Kapp, Hansen, and Spares with conspiracy to make or use a materially false writing concerning an aircraft part in violation of 18 U.S.C. §§ 38(a)(3) and (a)(1)(C). To prove conspiracy to make or use a materially false writing, the government must prove the following elements beyond a reasonable doubt:

(1) Beginning on or about 2007 and continuing through at least 2018, there was an agreement between two or more persons to make or use a materially false writing concerning an aircraft part in violation of 18 U.S.C. § 38(a)(1)(C); and

(2) The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

18 U.S.C. § 38(a)(3); Ninth Cir. Model Crim. Jury Instructions No. 8.20, comment (2019 edition) (proof of overt act is not required for conspiracy when the underlying statute does not require such proof); *see also United States Parker*, 553 F.3d 1309, 1316-17 (10th Cir. 2009) (citing *United States. v. Edwards*, 69 F.3d 419, 430 (10th Cir. 1995)).

As provided in the government's Bill of Particulars (ECF No. 1061), from 2002 through January 16, 2018, the defendants conspired to defraud the government and others by agreeing to

United States' Amended Trial Brief

19

falsely identify numerous counterfeit critical parts as legitimate parts, including the TRPCL identified as number 369A1807-9F. Although no overt act is required, the government will show that the defendants repeatedly made materially false writings, entries, certifications, documents, records, data plates, labels, and other electronic communications wherein they falsely represented the TRPCLs were legitimate, FAA-compliant parts.

    4.  <u>Count 11: Sale, Trade, or Installation of an Aircraft Part by Means of a Fraudulent Representation.</u>

Count 11 charges defendants Walker, Reed, Crowe, Kapp, Hansen, and Spares with unlawful sale, trade, or installation of an aircraft part by means of a fraudulent representation, in violation of 18 U.S.C. § 38(a)(2). To prove unlawful sale, trade, or installation of an aircraft part, the government must prove the following elements beyond a reasonable doubt:

    (1) The defendant sold, traded, or installed an aircraft part by means of a fraudulent representation;

    (2) The defendant acted knowingly and with the intent to defraud;

    (3) The defendant's action was in or affected interstate or foreign commerce.

18 U.S.C. § 38(a)(2).

    5.  <u>Count 12: Falsification or Concealment of a Material Fact.</u>

Count 12 charges Hansen and Spares with falsification or concealment of a material fact concerning an aircraft part under 18 U.S.C. § 38(a)(1)(A). To prove falsification or concealment, the government must prove the following elements beyond a reasonable doubt:

    (1) The defendant falsified or concealed a fact concerning an aircraft part;

    (2) The fact was material;

    (3) The defendant acted knowingly and with the intent to defraud;

    (4) The defendant's action was in or affected interstate or foreign commerce.

United States' Amended Trial Brief

20

18 U.S.C. § 38(a)(1)(A).

  6. <u>Count 13: Sale, Trade, or Installation of an Aircraft Part by Means of a Fraudulent Representation.</u>

  Count 13 charges Hansen and Spares with unlawful sale, trade, or installation of an aircraft part by means of a fraudulent representation, in violation of 18 U.S.C. § 38(a)(2). To prove unlawful sale, trade, or installation of an aircraft part, the government must prove the following elements beyond a reasonable doubt:

  (1) The defendant sold, traded, or installed an aircraft part by means of a fraudulent representation;

  (2) The defendant acted knowingly and with the intent to defraud;

  (3) The defendant's action was in or affected interstate or foreign commerce.

18 U.S.C. § 38(a)(2).

  7. <u>Special Issues.</u>

   **a. Facts Relevant for Sentencing.**

  If the jury finds one or more of the defendants guilty of aircraft parts fraud, the jury must then make the following factual determinations as to each Count for purposes of sentencing:

  (1) Does the offense relate to the aviation quality of an aircraft part and was that part installed on an aircraft?

  (2) Was the failure of the aircraft part to operate as represented the proximate cause of a malfunction or failure that resulted in serious bodily injury?

  (3) Was the failure of the aircraft part to operate as represented the proximate cause of a malfunction or failure that resulted in the death of any person?

18 U.S.C. § 38(b)(1) – (5); *see also United States v. Burkholder*, 816 F.3d 607, 615 (10th Cir. 2016) ("Congress explicitly included proximate-cause language in statutory penalty

United States' Amended Trial Brief

enhancements" for convictions under 18 U.S.C. § 38(b)); *Sudberry v. Arizona*, 463 F. App'x 629, 630 (9th Cir. 2011) ("Like gross negligence, proximate cause is generally a question of fact for the jury") (internal quotes omitted); *Exec. 1801 LLC v. Eagle W. Ins. Co.*, No. 3:18-CV-00580-SB, 2021 WL 5114665, at *9 (D. Or. June 11, 2021) ("[T]he Court [also] sees only support for the undisputed proposition that, as a general matter, questions of proximate cause should be left for the jury").

### b. As a Corporation, Hansen May Be Found Criminally Liable.

As a corporation, Hansen may be found guilty of aircraft fraud under the same laws that apply to a personal defendant. Corporate liability extends not only to acts authorized by the corporation, but also to that which outsiders would reasonably assume the corporate agent possessed authority to do.

In order to sustain its burden of proof for aircraft parts fraud counts, the government must also prove beyond a reasonable doubt that:

(1) Each of the acts committed by one or more officers, directors, employees, or agents were within the course and scope of the employment or agency by Hansen.

(2) The corporate officers, directors, employees, or agents committed each of the elements of the aircraft parts frauds with the intent to benefit Hansen.

*See New York Cent. & Hudson R.R. Co. v. United States,* 212 U.S. 481, 494–95 (1909); *United States v. Beusch,* 596 F.2d 871,877 (9th Cir. 1979); *United States v. Hilton Hotels,* 467 F. 2d 1000, 1004 (9th Cir. 1972), *cert denied*, 409 U.S. 1125, (Mem.)(1973); *United States v. Western Titanium, Inc.,* No. 08CR4229-JLS, 2010 WL 4659646 (S.D. Cal. Oct. 15, 2010) (Government's Proposed Jury Instr.); *Developments in the Law -- Corporate Crime: Regulating Corporate Behavior Through Criminal Sanctions*, 92 Harv. L. Rev. 1227, 1247 (1979).

//

United States' Amended Trial Brief

22

### E. Aircraft Registration Violations

Defendants are charged with two types of criminal aircraft registration violations under 49 U.S.C. § 46306(b): (1) unlawfully employing a mechanic or pilot without an FAA mechanic or pilot certificate; and (2) displaying a false or misleading mark of aircraft nationality or registration.

1. <u>Defendants Employed Scores of Uncertificated Mechanics and Pilots to Fix and Fly Hansen Helicopters.</u>

Counts 14 through 95 (with the exception of Count 76 which was voluntarily dismissed) charge defendants Walker, Reed, Crowe, and Kapp with knowingly and willfully employing uncertificated airmen in violation of 49 U.S.C. § 46306(b)(8). Federal law defines "airmen" as including both helicopter mechanics and helicopter pilots. 49 U.S.C. § 40102(a)(8). As airmen, helicopter mechanics and helicopter pilots are required to obtain an airman certificates before serving or working as a pilot or mechanic. 14 C.F.R. Part 61 (requiring FAA pilot certification); 14 C.F.R. Part 65 (requiring FAA mechanic certification).

To prove unlawful employment of an uncertificated mechanic or pilot, the government must prove the following elements beyond a reasonable doubt:

(1) The defendant knowingly and willfully employed an individual for service as an airman or used an individual in any capacity as an airman;

(2) The individual did not have an authorized airman certificate;

(3) The aircraft was not used to provide "air transportation."

49 U.S.C. § 46306(b)(8); *see also United States v. Atkinson*, No. 99-30180, 99-30181, 2000 WL 1015905, at *1 (9th Cir. July 21, 2000) ("Atkinson's attempts to analogize simple FAA regulations to highly technical tax laws are unpersuasive. The violation for which Atkinson was convicted— serving as an airman without a proper certificate—does not involve highly technical FAA regulations which might ensnare individuals engaged in apparently innocent conduct" (internal

quotations omitted)).

For purposes of this specific criminal statute, federal law narrowly defines "air transportation" to include foreign and interstate air transportation involving transportation of passengers, property, or mail for compensation as a common carrier. 49 U.S.C. § 40102(a)(5), (23), and (25). Because the defendants' helicopters did not transport passengers, property, or mail for compensation as a common carrier, the third essential element is not at issue in this case.

2. <u>Defendants Displayed False Markings of Aircraft Nationality and/or Registration.</u>

Counts 96 and 97 charge defendants Walker, Reed, Crowe, and Kapp with displaying a false marking of aircraft nationality and/or registration on Hansen's aircraft in violation of 49 U.S.C. § 46306(b)(3). To prove unlawful display of false markings, the government must prove the following beyond a reasonable doubt:

(1) The defendant knowingly and willfully[7] displayed or caused to be displayed a mark on an aircraft relating to the nationality or registration of the aircraft;

(2) The mark displayed or caused to be displayed by the defendant was false or misleading;

(3) The aircraft was not used to provide "air transportation."

Markings relating to an aircraft's tail number or "N-Number" are markings relating to "the nationality or registration of an aircraft." 14 C.F.R. § 45.23(a) (requirements for nationality and

---

[7] *United States v. Lloyd*, 807 F.3d 1128, 1166 (9th Cir. 2015) (in criminal prosecution for selling unregistered securities in violation of 15 U.S.C. § 77e, "willfully" does not require actor to have known conduct was unlawful (citing *Reyes*, 577 F.3d 1069)); and *United States v. Reyes*, 577 F.3d 1069, 1080 (9th Cir. 2009) (in prosecution for securities fraud, "willfully" means "intentionally undertaking an act that one knows to be wrongful; 'willfully' in this context does *not* require that the actor know specifically that the conduct was unlawful," quoting *United States v. Tarallo*, 380 F.3d 1174, 1188 (9th Cir. 2004) (emphasis in original)). In 18 U.S.C. § 1001, as well as cases alleging a false statement relating to health care matters in violation of 18 U.S.C. § 1035, the government must prove, among other things, that a defendant acted deliberately and with knowledge both that the statement was untrue and that his or her conduct was unlawful.

United States' Amended Trial Brief

registration markings). In the event the owner of an aircraft sells the aircraft to a foreign buyer, the seller must export the U.S. aircraft registration to the new country wherein the aircraft will be registered. 14 C.F.R. § 21.335 (responsibilities of exporters). The seller must also request cancellation of the U.S. registration and airworthiness certificates, return the U.S. registration and airworthiness to the FAA, and provide a statement to the FAA certifying that the U.S. identification and registration numbers have been removed from the aircraft. *Id.*; *see also* 14 C.F.R. § 45.33.

### F. Conspiracy to Commit Wire Fraud

Count 99 charges defendants Walker, Crowe, Kapp, and Reed (severed)with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343. To prove conspiracy to commit mail and wire fraud, the United States must prove that:

(1) There was an agreement between two or more persons to commit wire fraud;

(2) The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

Ninth Cir. Model Crim. Jury Instructions No. 8.20 (2019 edition).

Here, the evidence will show that the defendants entered into an agreement to defraud the government and their clients, various tuna boat companies, by means of materially false statements about the registration and airworthiness of leased helicopters, and executed their scheme by means of wire communications. The agreement that forms the basis for the conspiracy need not be explicit, but may be inferred from the defendant's acts or from other circumstantial evidence showing the conspirators acted together for a common illegal goal. *United States v. Calabrese*, 825 F.2d 1342, 1348 (9th Cir. 1987). The Ninth Circuit has held that "[i]nferences of the existence of such an agreement may be drawn 'if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose.'" *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996) (quoting *United States v. Monroe*, 552 F.2d

United States' Amended Trial Brief

25

860, 862 (9th Cir. 1997)).

Moreover, the government need not prove that the defendants committed an overt act in furtherance of the conspiracy in order to sustain a conviction. Conspiracy to commit wire fraud, 18 U.S.C. § 1349, does not contain an overt act requirement, and, as such, no proof of an overt act is required at trial. The United States Supreme Court has repeatedly held that proof of an overt act is not required when the applicable statute does not require proof of an overt act. *See e.g., Whitfield v. United States*, 543 U.S. 209, 215-16 (2005); *Salinas v. United States*, 522 U.S. 52, 63-66 (1997); *United States v. Shabani*, 513 U.S. 10, 15-16 (1994).

**G. Wire Fraud**

Counts 100 to 104 charge Walker, Reed, Crowe, and Kapp with wire fraud in violation of 18 U.S.C. §§ 1343, 1346, and 2. To prove wire fraud, the government must prove the following elements beyond a reasonable doubt:

(1) The defendant knowingly participated in or devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts. Deceitful statements of half-truths may constitute false or fraudulent representations;

(2) The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

(3) The defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

(4) The defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

Ninth Cir. Model Crim. Jury Instructions No. 8.124 (2021 edition); s*ee Neder v. United States*,

United States' Amended Trial Brief

26

527 U.S. 1, 20-25 (1999); *United States v. Woods*, 335 F.3d 993, 997 (9th Cir. 2003).

The wire fraud statute focuses on the scheme to defraud rather than actual fraud. *United States v. Andreadis*, 366 F.2d 423, 431 (2d Cir 1966). Accordingly, the United States is not required to prove that anyone was defrauded or sustained a loss. *See e.g., United States v. Rasheed*, 663 F.2d 843, 850 (9th Cir. 1981). In other words, the defendants need not have succeeded in their scheme to be guilty of wire fraud. *United States v. Utz*, 886 F.2d 1148, 1150 (9th Cir. 1989).

Furthermore, the government need not present direct proof of fraudulent intent; fraudulent intent may be proved by demonstrating that a representation was made with reckless indifference to its truth or falsity. *See e.g. United States v. Dess*, 34 F.3d 838, 842-43 & n.1 (9th Cir. 1994); *United States v. Gay*, 967 F.2d 322, 326 (9th Cir. 1992). In addition, fraudulent intent may, and often must be, proven by circumstantial evidence, and can be inferred from the activities of the parties involved. *See Rasheed*, 663 F.2d at 848, (9th Cir. 1981); *United States v. Jones*, 425 F.2d 1048, 1058 (9th Cir. 1970); *Phillips v. United States*, 356 F.2d 297, 303 (9th Cir. 1965).

Here, defendants knowingly, and with the intent to deceive and cheat, participated in a scheme to defraud the government and tuna boat companies by means of false statements concerning the registration and airworthiness of leased helicopters. Defendants used interstate and foreign wire communications to accept payments from tuna boat companies as a means of carrying out an essential part of their scheme.

**H. Money Laundering**

Counts 105 through 110 charge defendant Walker with money laundering in violation of 18 U.S.C. § 1957. To prove money laundering, the government must prove each of the following elements beyond a reasonable doubt:

(1) The defendant knowingly engaged or attempted to engage in a monetary transaction;

(2) The defendant knew the transaction involved criminally derived property;

United States' Amended Trial Brief

27

(3) The property had a value greater than $10,000;

(4) The property was, in fact, derived from wire fraud; and

(5) The transaction occurred in the United States.

Ninth Cir. Model Crim. Jury Instructions No. 8.150 (2021 edition). The term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate commerce[8], of funds or a monetary instrument by, though, or to a financial institution. Ninth Cir. Model Crim. Jury Instructions No. 8.123A; 18 U.S.C. § 1957(a). The term "criminally derived property" means any property constituting, or derived from, the proceeds of a criminal offense. The government must prove that the defendant knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense. *Id.* The government does not have to prove that the defendant knew the precise nature of that criminal offense, or knew the property involved in the transaction represented the proceeds of Wire Fraud. *Id.*

## I. Forfeiture Is a Matter for the Court

Criminal forfeiture is not an element of the criminal offenses with which a defendant is charged; rather, it is a form of punishment that is imposed as part of the criminal sentence. *Libretti v. United States*, 516 U.S. 29, 39-40 (1995). The procedures for determining the forfeitability of assets in criminal cases are set forth in Rule 32.2 of the Federal Rules of Criminal Procedure.

//

//

//

---

[8] The term "interstate commerce", as used in this title, includes commerce between one State, Territory, Possession, or the District of Columbia and another State, Territory, Possession, or the District of Columbia. 18 U.S.C. § 10.

United States' Amended Trial Brief

28

# IV.    ANTICIPATED EVIDENCE

## A.  Witnesses

### 1.  Former and Current Hansen Employees.

- Michael Hamouz
- Jonathan Hurley
- David Walters
- Francis Holmes
- Jason King
- Spencer Wageman
- Kevin Warner
- Rigoberto Linares
- Lito Arce
- Leslie Zuroske
- Roel M. Dorian
- Thomas Geluz Bustos

- Gelacio Agualada
- Medilyn Cunanan Calma
- Dianne Keller
- William Lee Lucas
- Maria Socorro JC Snaer
- Jose Eduardo Marinho Gonsalves
- Brian Dalke
- Robert Dodd Plew
- Ben Parker
- Brian Jewell
- Marc Braga

| FORMER AND CURRENT HANSEN EMPLOYEES | |
|---|---|
| Name and Company | Summary Testimony |
| Michael Hamouz<br>Former Hansen Pilot | On April 2014, Hamouz met with Crowe in Guam and performed a trial flight with Crowe.  While on Guam, he also met with Reed.  Hamouz signed a 12-13 month contract with Hansen and stayed in the "Pilot House" also provided by Hansen. Recalls aircraft (N4250N) he flew had "N Number." Stated Marlin (LNU) was from the Philippines and was the aircraft mechanic that performed maintenance and repairs on aircraft flown by Hamouz. |
| Jonathan Hurley<br>Former Hansen Pilot | Hurley worked at Hansen from September 2013 for several months and was assigned to N336HH. He can testify to Hansen not conducting annual inspections, lack of logbooks, use of unapproved parts, and procurement of Italian helicopters. |
| David Walters<br>Former Hansen Pilot | During an April 9, 2019 interview, Walters stated he worked for Hansen from December 2014 to February 2016, and understood he was a direct employee w/Hansen. He was assigned to an Army OH-6 helicopter (N369MV).  Walters never saw a logbook for his helicopter.  Walters kept in contact with Reed and Kapp while at sea. He also said Hansen aircraft were often former Law |

| FORMER AND CURRENT HANSEN EMPLOYEES | |
|---|---|
| Name and Company | Summary Testimony |
| | Enforcement aircraft and/or military. Said TRPLs were taped together in plastic bags, and was not aware of any serial numbers on links. Stated he was replaced by Ed Norman, an Australian pilot who was not FAA certified. Said Norman survived a crash in N369MV w/in a year of replacing Walters. Thought the auto-inflating feature of the vests were problematic.<br><br>Walters said he crashed N369MV and informed Kapp and Crowe. He never discussed with Hansen whether to file report with FAA or NTSB. Walters, also worked with Jeffrey (LNU) and other Philippine mechanics to remove gearbox, placed it in passenger compartment, and placed entire helicopter into shipping container. |
| Francis Holmes<br>Former Hansen Pilot | Holmes was the Chief Pilot for Tropic Helicopters. He witnessed Hansen employees retrieve discarded helicopter parts. Holmes authored book for tuna pilots, and Hansen management was furious. Holmes believed Walker used old engines on their aircraft to reduce costs. |
| Jason King<br>Former Hansen Pilot/Mechanic | King worked for Hansen in February 2016. He "guessed" there may have been non-certified mechanics working under the supervision of certified mechanics at Hansen. King said Kapp was the primary POC for mechanics on the boats. King flew N66HH (an OH-6A helicopter), and replaced TRPLs every 50 to 100 hours. He said the links came taped together and recalled they had a part number (not on the part itself), but no serial number. |
| Spencer Wageman<br>Former Hansen Pilot<br>Air Evac Lifeteam O'Fallon, MO | Wageman piloted N40490 (green and yellow, appeared to be from another country) aboard Fung Ko and Sea Fox from 4/2015 to 6/2016. His mechanic was Keiron Mandes who did not possess a FAA certificate. |
| Kevin Warner<br>Former Hansen Pilot/Mechanic<br>Arise Helicopters Corona, CA | Warner worked at Hansen on two separate occasions: 1991, assigned to N101JP and 2014-2015, assigned to N66HH. During 2014-2015, he witnessed green-yellow Italian helicopters in the hangar being stripped and rebuilt. Warner conducted maintenance work and emailed Hansen where he was told logbooks were kept. He |

| FORMER AND CURRENT HANSEN EMPLOYEES | |
|---|---|
| Name and Company | Summary Testimony |
| | believed Crowe and Kapp made millions by cheating. Believed Hansen mechanics were not FAA certified and spoke little English. |
| Rigoberto Linares<br>Former Hansen Pilot | Linares is a former Hansen pilot who flew N805LA which crashed into the ocean. Linares sustained a fracture to his back as a result of crash. Linares also said Crowe advised him the Japanese spotter suffered a back compression. He confirmed that Antonio Padua was his mechanic for the helicopter. Linares was bedridden/heavily medicated in the hospital when Crowe completed the NTSB Form 6120 which indicated Linares sustained minor injuries. Linares said he received a phone call from Crowe asking him to leave the helicopter in the water while Linares was lying on the floor injured. |
| Lito Arce<br>Hansen Employee | Arce is a "runner" for Hansen whose duties includes checking the mail, getting money from the bank, buying supplies, and dropping off and picking up packages and cargo. He picked up two Hansen packages which included "pitch links." He informed agents that Elorde Tomenio (not US certificated) worked at Hansen in Guam for a number of months, and Elorde received money for working. Advised that other foreign mechanics arrived in Guam and stayed for months working at Hansen.<br><br>Arce said once a month, Arce obtains cash ranging from $5,000 top $10,000 from Hansen's Bank of Hawaii account for the foreign workers' payroll. He provides the cash to Jo Snaer who oversees the cash payments to the foreign workers. The foreign workers must sign a receipt upon payment, which Snaer maintains. Arce said most foreign mechanics on fishing vessels receive monthly payment by wire transfer from Hansen. Also, Arce sent money by Western Union to Hansen workers in Philippines, Marshall Islands, Pohnpei, and Hawaii. Reed or Kapp would provide specific payment information to Arce to complete any money transfers.<br><br>Arce said foreign mechanics stay at Hansen's |

United States' Amended Trial Brief

31

| FORMER AND CURRENT HANSEN EMPLOYEES | |
|---|---|
| Name and Company | Summary Testimony |
| | apartment in Harmon, and the workers use Hansen's vehicle for transport to Hansen and back.<br><br>He also recalled a helicopter crash approximately 2-3 years ago where "spotter" was injured. |
| Leslie Zuroske<br>Chief Financial Officer<br>Hansen Helicopters | Zuroske is the Chief Financial Officer for Hansen and is responsible for the accounting functions of Hansen. He said Caledonian Agency is a Saipan corporation and is "affiliated" with Hansen. Zuroske said Caledonian is holding funds for Wilma's Flight Services, Inc., Beanbag Helicopters, Inc., and Caledonian Insurance Company Limited. He also said Hansen Northern Helicopters, Inc. is a Hansen affiliate as well. Zuroske further stated Caledonian Insurance Company Limited is a captive insurance company (used in the insurance business and domiciled in overseas locations). The insurance is for the helicopters that Hansen leases to the fishing vessels. Zuroske stated in his role as CFO for Hansen, he has overall responsibility for the affiliates to include the Vanuatu international companies. He admits the directors for the Vanuatu companies are Walker and Crowe. He acknowledged the $40,000 lease for each helicopter and gross revenues would be $14.4 million for 30 helicopters. Zuroske also stated Wilma's Flight Services is responsible for collecting all lease payments. Zuroske admits foreign workers work for the Hansen affiliates, and he has the overall responsibility to ensure they are paid. |
| Roel M. Dorian<br>Hansen Employee | Dorian is a parts buyer and shipper for Hansen. He admitted he is not aware of the FAA requirements when he buys parts for Hansen's aircraft. Dorian indicated that Kurtis Crowe, Crowe's son, helps him with the parts invoices. He admits to buying parts, to include TRPCLs, from Spares knowing they did not have FAA parts manufacturing approval, and he ordered parts at the direction of Kapp. Dorian said the TRPCLs seized from SW were the type Hansen used on their aircraft. |
| Thomas Geluz Bustos<br>Former Hansen Pilot | Bustos will testify to Hansen's un-safe operations, use of non-FAA pilots/mechanics, and admit |

| FORMER AND CURRENT HANSEN EMPLOYEES | |
|---|---|
| Name and Company | Summary Testimony |
| | exhibits. He will also provide testimony to support aircraft parts fraud, that they had to install the bearings themselves for the TRPCL, and parts were not accompanied by necessary tags. |
| Gelacio Agualada<br>Hansen Mechanic | Agualada is a FAA licensed mechanic and senior mechanic at Hansen. He said Hansen owns OH-6 military or 369 civilian models. Agualada said Hansen has 40-42 helicopters that are provided for tuna fishing. He admits majority of the mechanics that work on the helicopters are not FAA certified and most have their license in the Philippines. He admitted that at least 5 of Hansen's aircraft have crashed and was aware that injuries occurred. He said the "dog bone" [TRPCL] found in Search Warrant would have been ordered by Roel Dorian and he used some of part. He also indicated Crowe and Kapp were aware that he used this part. Agualada indicated that Antonio Padua was employed for a number of years with Hansen as a tuna boat mechanic. Was present along with Reed and Kapp at the scene when N805LA was brought into port and observed the damage from the crash. |
| Medilyn Cunanan Calma<br>Former Hansen Employee | Calma previously worked for Hansen as an office clerk. At Hansen, her duties included accounting work, invoicing, and scheduling travel with One Stop Travel for Hansen mechanics and pilots. Calma said Reed would hire the mechanics and Crowe would hire the pilots. Calma would prepare the employment contracts for the mechanics and pilots. Calma said Hansen used foreign mechanics, mostly from Philippines or Mexico. She said the mechanics would often stay on Guam 1-2 months before heading out to a fishing vessel. The contracts were for one year they mechanics would have B1/B2 visas or C1/D visas. She admitted she requested for "fictitious" itineraries from One Stop for the mechanics and pilots to clear U.S. Immigration, and Hansen would cancel the follow-on portion. She was told to do this by Reed and Snaer. Calma further said Hansen was providing false documentation and instructing mechanics and pilots to lie to immigration officials to stay in Guam and train at Hansen. She further said Hansen would pay the foreign pilots and |

United States' Amended Trial Brief

33

| FORMER AND CURRENT HANSEN EMPLOYEES | |
|---|---|
| Name and Company | Summary Testimony |
| | mechanics by EBT and sometimes in cash. She said Lito Arce would cash payment checks at Bank of Hawaii and bring the cash to Snaer who placed the cash in envelopes for the foreign employees. Calma said the foreign employees would live in a Hansen apartment. |
| Dianne Keller<br>Hansen Employee | Keller is an administrative assistant with Hansen who also does the travel arrangements with One Stop Travel for all Hansen employees. Keller assisted with the contracts for the pilots and mechanics with the tuna boats. She admits the contracts were mainly under Wilma's Flight Service. Keller admits Crowe tells her to work the contract for pilots and Kapp for mechanics and to prepare contracts under Wilma's Flight Service. Keller also stated most of the mechanics are from the Philippines. Keller admitted she would cancel the exit tickets for the foreign workers once they are on the tuna vessel at the direction of Kapp and Reed. She also forward the tickets to the CAAP [Philippine] officials who came to Guam at the direction of Kapp. |
| William Lee Lucas<br>Former Hansen Employee | Lucas was a sheet metal mechanic and had his A&P license while at Hansen. He said he assisted with repairing "possibly" more than three helicopters involved in an accident or crash at the direction of Kapp. Lucas said Kapp took care of the documentation of the work performed on the helicopters. He said Hansen had no requirement to enter logbook entries and he had no access to logbooks. Lucas further said Reed would order the registration numbers for Lucas to put on the helicopter. Lucas recalls Hansen having five or less Guardia Di Finanza [Italian] helicopters. He said Kapp, Reed, and Walker knew Lucas worked on these helicopters for flight. Lucas further said these helicopters had no data plates on them, but later saw them with data plates. Lucas said Hansen leased helicopters to the fishing vessels. Lucas said he is aware that people have died in Hansen's helicopters that landed in water. He further stated Hansen discarded parts from a wrecked aircraft and tail boom. Lucas further said Hansen received approx. 5 helicopters with data |

United States' Amended Trial Brief

34

| FORMER AND CURRENT HANSEN EMPLOYEES | |
|---|---|
| Name and Company | Summary Testimony |
|  | plates, but no registration numbers. Lucas said the TRPLs at Hansen did not have a part number on them. He also said Reed and Kurtis Crowe were in charge of ordering parts. He said "Tabby" was responsible for installing TRPCLs on helicopters and Kapp was aware of this. He also said Hansen used foreign mechanics from the Philippines to work on the helicopters that were on the fishing vessels. |
| Maria Socorro JC Snaer<br>Hansen Employee | Snaer is an accountant for Hansen who handles payroll and payables. She said Caledonian Agency, Inc., Hansen Northern Helicopters, Inc., Wilma's Flight Service, and the 30 Vanuatu companies are subsidiaries of Hansen. Snaer also said that her supervisor, Zuroske, is responsible for the accounting of the subsidiaries. Snaer said these Hansen subsidiaries lease helicopters to fishing vessels. Snaer said the leasing of 40 helicopters at $40K a month amounts to $19.2 million a year. Snaer further said Hansen and its subsidiaries have 90-100 pilots and mechanics mostly foreign workers and are paid by wire transfer. Snaer said at the direction of Crowe, she conducted the wire transfer for the aircraft given to Cislo. She notarized the document Crowe generated which said N9068F crashed at sea and registration and cert. of airworthiness were lost. She also notarized docs that Crowe sent which requested to cancel registration for N243D since it was exported to the Philippines. Snaer also admitted that employees were given cash allowances for their wages. She corroborates that Crowe did the hiring for foreign pilots while Kapp did the hiring for foreign mechanics. Snaer further indicated that Hansen rents an apartment at Sunrise D where a foreign worker (Tomenio) stayed. |
| Jose Eduardo Marinho Gonsalves<br>Hansen Pilot | Marinho is a dual citizen of Brazil and Spain, worked for Hansen as a pilot from May 2019 to June 2020. Marinho had entered the Marshall Islands from a tuna boat during the COVID lock down to escape the stressful situation he was in operating Hansen's aircraft. He documented the work performed by Hansen's foreign mechanics to include the use of fraudulent TRPCLs. Marinho, a |

United States' Amended Trial Brief

35

| FORMER AND CURRENT HANSEN EMPLOYEES | |
|---|---|
| Name and Company | Summary Testimony |
| | non-FAA certified pilot, flew N26MV, N336SP, and N45777 owned by Hansen. His deposition will be entered at trial. |
| Brian Dalke<br>Former Hansen Pilot | Pilot for Hansen from 2/2015 to 2/2016. Worked with two Filipino mechanics, certificate status unknown. |
| Robert Dodd Plew<br>Hansen Employee | Plew is employed as a mechanic apprentice with Hansen. He primarily works on pending work orders which are posted. He helps prepare shipping of repair parts and components; inventory parts; assists one of the Hansen license mechanics in the build, re-build, maintenance, and repair of hard parts/components subject to physical wear and limited flight life, among other things. Plew said some of the maintenance and repairs are conducted by the helicopter leaseholders (tuna vessels) while underway at sea. Other repairs that cannot be done at sea are done at Hansen. He said the parts requiring repair are shipped to and from Hansen for servicing. |
| Ben Parker | Former Hansen pilot assigned to N2058X. Unaware if his mechanic was FAA-certified, never saw logbooks. |
| Brian Jewell | Former Hansen supply manager will testify to the use of unapproved aircraft parts acquired from Spares and switching of data plates following an accident. |
| Marc Braga<br>Former Hansen Pilot | Former Hansen pilot with knowledge of crash of RPC4910. |

2. Other Fact Witnesses.

- Mark Anderson
- Norman Chang
- Karen Duenas
- Lynn Marie Leon Guerrero
- Dena Krystal Rendon
- Felix R.I. Concepcion
- Edward "Ed" Brown
- Christopher Yom
- Eric J. Secrest
- James G. Marson
- John Popecki

- Timothy Cislo
- Michael Leo Shults
- Victor Litkei
- Juliet Crowe
- Gary Robertson
- Mary D. Rogers
- Barbara Doty
- Gabriel Ko
- Roger Bruce Campbell Shepard
- Dr. David Weingarten
- Dr. Alix Chennet

United States' Amended Trial Brief

36

- Chris Wolfe
- Kurtis Crowe
- Randy Breitzman

| OTHER FACT WITNESSES | |
|---|---|
| Name and Company | Summary Testimony |
| Mark Anderson<br>Sheet Metal worker<br>Vanguard Aviation, Inc. | Anderson works for Rogers as a mechanic, and stated he worked on N243D and N907HH. |
| Norman Chang<br>One Stop Travel | Owner of One Stop Travel and has had a business relationship with Hansen, Walker, and others for years. He will testify that in his dealings with Hansen, they requested that the return trips for their employees be cancelled. |
| Karen Duenas<br>One Stop Travel | Worked with Hansen to coordinate the flight itineraries for Hansen's foreign pilots and mechanics to travel through Guam and out to the outer islands. |
| Lynn Marie Leon Guerrero | Leon Guerrero was the former Superintendent with Cabras Marine. She noticed Hansen representatives at the pier and saw an injured passenger in a stretcher that needed to be offloaded from the tugboat. Leon Guerrero was made aware another injured passenger was previously assisted off the tugboat and was inside a Hansen van. When Leon Guerrero attempted to call 911 for the injured passenger, a Hansen employee yelled to cancel the call. She saw a crane being used to offload the injured passenger off the tugboat. She did observe the damaged helicopter which did not have any rotor blades. |
| Dena Krystal Rendon<br>Dispatcher<br>Cabras Marine | Rendon said several days prior to the offloading of a damaged helicopter (later identified as N805LA), Gabriel Ko from Isla Maritime hand delivered a notice of arrival which requested an emergency port call to offload a damaged helicopter and disembark two injured crewmen. Rendon did not speak with anyone from Hansen about the notice of arrival or offloading of the helicopter. |
| Edward "Ed" Brown<br>President<br>Heli-mart | Brown attempted to procure 10 helicopters from the Italian gov't, but the deal fell through after learning they were Breda Nardis. In mid-2019, Kapp shipped a wrecked helicopter, N192PB, to Brown in Long Beach, which was later inspected by FAA. |
| Christopher Yom<br>Captain | Yom was the Captain of the Pacific Ranger. He was aware of the helicopter crash involving aircraft later identified as N501SU. He said the aircraft was missing the main rotor blade and the tail rotor was |

United States' Amended Trial Brief

37

| OTHER FACT WITNESSES | |
|---|---|
| Name and Company | Summary Testimony |
| | gone, among other things. Yom said Domingo Libao served as pilot and mechanic for the Pacific Ranger. Yom said Libao informed him that Hansen instructed Libao not to allow anyone to take photos or document the crashed helicopter. Yom further saw Libao make alterations to the damaged helicopter while on vessel. He saw Libao remove the remaining main rotor blades and also conduct an engine overhaul. Yom recalls when the helicopter was off-loaded in Pohnpei, all rotor blades were removed, and the aircraft was partially covered with tarp. |
| Eric J. Secrest<br>Broker | Coordinated with defendant Crowe and others, to facilitate the $22,500 wire transfer to purchase the Taylorcraft BC-12D Aircraft, which is the aircraft used by Hansen to bribe Timothy Cislo. |
| James G. Marson<br>Former Owner of<br>N243D/Retired | Marson is the original owner of aircraft N243D, destroyed in an accident and sold as scrap to someone other than the defendants. Defendants forged Marson's signature on a bill of sale that misrepresented to the FAA that the aircraft was "erroneously reported as destroyed," and that it had been purchased directly from Marson by defendants. His deposition will be entered at trial. |
| John Popecki<br>Mechanic | Popecki is an aircraft mechanic with the Alaska North Slope Borough, Search and Rescue Utqiagvik (Barrow). Popecki will testify to the alterations, modifications, maintenance performed, and documentation required to convert James Marson's N243D from a military OH-6 aircraft to a MD-500 civilian helicopter to achieve FAA airworthiness, based on his personal knowledge of that work. Popecki will render further expert testimony regarding OH-6/369A aircraft technical details, among other things. |
| Timothy Cislo<br>Former FAA Safety Inspector<br>Pacific Compliance Aviation<br>Services, LLC DBA | Cislo will testify regarding the use of his position as a FAA Safety Inspector and used his position to sign, issue and re-issue FAA Airworthiness Certificates for Hansen aircraft without conducting the necessary inspections and examinations of the helicopters. Cislo received bribes to include a Taylorcraft BC-12D aircraft for his role in the scheme. |

United States' Amended Trial Brief

38

| OTHER FACT WITNESSES | |
|---|---|
| Name and Company | Summary Testimony |
| Michael Leo Shults<br>President<br>Eastern Shore Helicopters | Shults can testify to the transaction of N243D (scrap), N345SD (scrap), and N501SU from Barbara Doty to Shultz, then to Hansen. |
| Victor Litkei<br>Secretary<br>Spares Inc. | Is the son of Frank Litkei and is the Secretary of Spares, Inc. He has also opened another corporate entity to take the place of Spares in relation to Department of Defense contracts. |
| Juliet Crowe | During a October 26, 2016 interview with law enforcement, Juliet said Crowe and John Walker were business partners with Americopters which only had one aircraft. She said Kapp is a mechanic and pilot for Americopters. Juliet said the money Crowe makes from Americopters get deposited into her bank account. Juliet said Crowe sold Americopters to Walker. She said Kapp is working for Walker at Hansen. She said Crowe runs Hansen while Walker is away, and Crowe is a pilot. She further said Kapp is Director of Maintenance. |
| Mary D. Rogers<br>Vanguard Aviation, Inc. | Defendant Rogers' wife who can testify to the history and business operations of Vanguard Aviation. |
| Barbara Doty<br>Former OH-6 Owner | Doty will testify to the sale of N243D (scrap), N345SD (scrap), and N501SU to Shultz following her husband's death. |
| Gabriel Ko<br>Owner<br>Isla Maritime Agency | Several days prior to the offloading of a damaged helicopter (later identified as N805LA), Gabriel Ko from Isla Maritime hand delivered a notice of arrival which requested an emergency port call to offload a damaged helicopter and disembark two injured crewmen. |
| Roger Bruce Campbell Shepherd<br>Civil Aviation Authority of New Zealand | Shepherd will testify as to the two aircraft Hansen had registered with CAANZ and that a notice was given that both aircraft were going to be deregistered. |
| Dr. David Weingarten | Dr. Weingarten will testify as to the injuries sustained by former Hansen Pilot Rigoberto Linares which included a fractured back. He will also testify as to the statements Linares made to him on how he sustained the injuries. |
| Dr. Alix Chennet | Dr. Chennet will testify as to his observations of the injuries sustained by Japanese spotter Kazuya Hiratsuka who was onboard N805LA when it crashed while being piloted by former Hansen pilot Rigoberto Linares. He will also testify as to the |

United States' Amended Trial Brief

| OTHER FACT WITNESSES | |
|---|---|
| Name and Company | Summary Testimony |
| | statements Hiratsuka made to him on how he sustained the injury. |
| Chris Wolfe MD Helicopters, Inc. | Chris Wolfe is no longer with MD Helicopters as of October 2020, but has personal knowledge of the OH6 helicopters used by defendants, the FAA requirements for use and maintenance of said aircraft, and the necessity to use only approved parts. |
| Kurtis Crowe | Crowe's son and parts purchaser at Hansen. |
| Randy Brietzman Accident Investigator/SUP | MD Helicopters expert who can testify to the criticality of suspected unapproved parts, airworthiness, type certificates, the Italian helicopters, and the initiation of the investigation into defendants' criminal actions. |

3. Records Custodians[9].

- Joseph P. Bacon
- Vivian Quinata, Custodian of Records, Bank of Hawaii
- Dana Sybert, Custodian of Records Community Bank & Trust
- Chona Atalig, Custodian of Records Community First Guam
- Victoria Hernandez, Custodian of Records Internal Revenue Service
- Jerome Aguon, Disclosure Officer Guam Department of Revenue & Taxation

- Monica Franquez, Custodian of Records Business License Division Guam Department of Revenue & Taxation
- Jessica Mary San Nicolas, Custodian of Records, Guam Regional Medical Center
- Tina Quinata, Custodian of Records, Guam Memorial Hospital

| RECORDS CUSTODIANS | |
|---|---|
| Name and Company | Summary Testimony |
| Joseph P. Bacon Fidelity Investments | Introduce records from Fidelity Investments that were used to seize a portion of the $4.6 million in 2018. |
| Vivian Quinata Custodian of Records Bank of Hawaii | Quinata will introduce records from Bank of Hawaii pertaining to the defendants account and discuss how ACH deposits work. |
| Dana Sybert | Sybert will introduce records of the bank account that |

[9] The government has requested lead counsel for the defense, Mr. McConwell, agree to waive the necessity for calling records custodians.

United States' Amended Trial Brief

40

| RECORDS CUSTODIANS | |
|---|---|
| Name and Company | Summary Testimony |
| Custodian of Records<br>Community Bank & Trust | received the wire fraud proceeds laundered into it from a Bank of Hawaii account controlled by Walker, Reed, and Crowe. |
| Chona Atalig<br>Custodian of Records<br>Community First Guam | Atalig will introduce records, which will show Kapp's involvement with an account receiving wire transfers from the bank account in the Philippines, which is where the helo lease payments are being made. |
| Victoria Hernandez<br>Custodian of Records<br>Internal Revenue Service | Hernandez will introduce records. The records will show Walker's failure to file a tax return with the IRS. |
| Jerome Aguon<br>Disclosure Officer<br>Guam Department of Revenue & Taxation | Aguon will introduce records. The records in our possession show that the defendants underreported Hansen's gross income and it also shows Walker as the sole shareholder and the various subsidiaries under HH. We have corporate tax returns for 2014 & 2015 but non-filing in 2016. |
| Monica Franquez<br>Custodian of Records<br>Business License Division<br>Guam Department of Revenue & Taxation | Franquez will introduce records. The records establish the shareholders and true ownership and control of the various companies involved in the investigation including Caledonian Insurance, Hansen, etc. |
| Jessica Mary San Nicolas<br>Custodian of Records<br>Guam Regional Medical Center | San Nicolas will testify as to the medical records provided by GRMC pursuant to the Grand Jury subpoena which relate to patient, former Hansen pilot Rigoberto Linares from N805LA accident. |
| Tina Quinata<br>Custodian of Records<br>Guam Memorial Hospital | Quinata will testify as to the medical records provided by GMH pursuant to the Grand Jury subpoena which relate to patient, Japanese spotter Kazuya Hiratsuka from the N805LA accident. |

    4.  <u>Federal Agents and Employees.</u>

- Viranosith Khamvongsa Special Agent, Internal Revenue Service
- Peter Prozik, Federal Bureau of Investigation.
- Wynton El, Federal Bureau of Investigations
- Michael Gadsden, Federal Bureau of Investigations
- Patrick Ernst Federal Bureau of Investigations

- Misty Pena Supervisory Management & Program Analyst FAA Southwest Regional Office
- Mark Pablo, CBP Officer DHS/Customs and Border Protection
- Kathleen Davis, Federal Reserve Bank
- Richard Ficarelli DOT-OIG Special Agent

United States' Amended Trial Brief

41

- John McDuffie CBP Officer DHS/Customs and Border Protection
- Douglas Dymock Aviation Safety Inspector FAA Southwest Regional Office
- Glenda White DOT-OIG Special Agent
- Reggie Lee DOT-OIG Special Agent
- Mike Boler, SEIT/FAA
- Howard Martin, FAA Legal

| FEDERAL AGENTS AND EMPLOYEES | |
|---|---|
| Name and Company | Summary Testimony |
| Viranosith Khamvongsa Internal Revenue Service | Khamvongsa will testify as to the wire fraud and money laundering charges reflected in SSI. |
| Peter Prozik Federal Bureau of Investigation | Prozik will testify as to the search warrants conducted on Hansen's premises in October 2016, the various interviews he conducted, and his involvement in the investigation. |
| Wynton El Federal Bureau of Investigations | El is the FBI CART representative who will testify as to the electronic evidence that was seized during the October 2016 search warrant and how the evidence was managed by the FBI. |
| Michael Gadsden Federal Bureau of Investigations | Gadsden will testify as to the statements Reed made to him during search warrant at Hansen premise in October 2016 and when Reed was arrested in October 2018. |
| Patrick Ernst Federal Bureau of Investigations | Ernst will testify as to his observations during the search warrant in October 2016 to include the boat assignments for the various Hansen aircraft. Additionally, Ernst will testify as to the statements made by Reed regarding Hansen operations. |
| John McDuffie Department Homeland Security/Customs and Border Protection | McDuffie will testify as to his involvement and observations inspecting N500LA and other aircraft parts that were shipped through American Samoa and subsequently detained in Hawaii. |
| Douglas Dymock Aviation Safety Inspector FAA Southwest Regional Office | Dymock is with FAA SEIT and will testify as to his involvement, observations, and dealings with his inspection of Hansen's aircraft, maintenance facility, and communications he has had with Hansen employees, among other things. |
| Misty Pena Supervisory Management & Program Analyst FAA Southwest Regional Office | Pena is a SEIT Analyst and will testify as to the FAA records on file for Hansen and its subsidiaries, the summary charts she created therefrom, the lack of FAA certification for the pilots and mechanics reflected in the SSI. |
| Mark Pablo CBP Officer | Pablo will testify about the visas the defendants used to bring foreign mechanics and pilots through |

United States' Amended Trial Brief

42

| DHS/Customs and Border Protection | Guam and onto the neighboring islands for work on the tuna vessels. |
|---|---|
| Richard Ficarelli Department of Transportation | Ficarelli will testify as to the mechanics and pilots counts, and his role in the investigation to include the various interviews he conducted, and the summary chart regarding the mechanics and pilots. |
| Glenda White Department of Transportation | White will testify as to the aircraft parts counts related to Spares, Inc. She will also testify as to her role in the investigation to include the various interviews she conducted. |
| Reggie Lee Department of Transportation | Lee will testify as to his role in the investigation to include the various interviews he conducted. |
| Mike Boler SEIT/FAA | Boler will testify as to his involvement, observations, and dealings with his inspection of Hansen's aircraft, maintenance facility, and communications he has had with Hansen employees, among other things. |
| Howard Martin Legal FAA | Martin will testify in rebuttal as necessary to refute any defense contentions regarding the validity of the registrations. |

5. Expert Witnesses

The government may call the following expert witnesses at trial. The government provided notice to the defense of the identity of its expert and the subject matter of their testimony, along with copies of their curriculum vitae. Expert testimony is proper in order to present "scientific, technical, or other specialized knowledge" which "will assist the trier of fact to understand the evidence or to determine a fact in issue..." Fed. R. Evid. 702. Expert testimony must be both relevant, i.e., it must have a valid connection to the pertinent inquiry at trial, and reliable, i.e., it must be trustworthy. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

- Jeff Guzzetti: President Guzzetti Aviation Risk Discovery, LLC.
- Jeff Klang: Assistant Chief Counsel for FAA International Affairs & Legal Policy Division
- Sergio Lopez: Supervisory Aviation Safety Inspector FAA Miami FSDO-19.
- Robert Sprayberry: Aerospace Engineer FAA International Policy Division.
- Teshara B. Jones: Defense Contract Audit Agency
- Arthur Randal Steffes: FAA Special Emphasis Investigation Team
- Jeffrey M. Jennings: FAA employee/pilot/expert in Part 91 operations

United States' Amended Trial Brief

43

- John Popecki: expert mechanic

| EXPERT WITNESSES | |
|---|---|
| Name and Company | Summary Testimony |
| Jeff Guzzetti<br>President<br>Guzzetti Aviation Risk Discovery, LLC | Guzzetti is President of Guzzetti Aviation Risk discovery, LLC (GuARD), and is an aviation safety consultant, instructor, investigator, surveyor, and writer. He will also testify as to the information reflected in ECF 480, his summary charts, and the inspection report from the inspection in Georgia. |
| Jeff Klang<br>Supervisory General Attorney<br>FAA Great Lakes Regional Office | Klang is an Assistant Chief Counsel for International Affairs & Legal Policy Division, and is responsible for providing legal guidance and assistance to the program offices in developing FAA policies to ensure US airmen, aircraft and operators meet FAA regulatory requirements and ICAO international standards operating across and US airspace. He will also testify as to the content in ECF 471, and in rebuttal to defense misrepresentations of applicable law. |
| Sergio Lopez<br>Supervisory Aviation Safety Inspector<br>FAA Miami FSDO-19 | Lopez is Manager of FAA South Florida Flight Standards District Office and is responsible for ensuring the airworthiness and safe flight operations of aircraft, air agency, and airmen within the district office's area of responsibility. He will also testify as to the contents in ECF 468 and the inspection report from the inspection in Georgia.. |
| Robert Sprayberry<br>Aerospace Engineer<br>FAA International Policy Division | Sprayberry is an FAA employee with International Policy Division, and is primarily responsible for administering the FAA's international validation policy found in 14 CFR 21.29. He is a parts expert. He will also testify as to the contents in ECF 470 and the inspection report from the inspection in Georgia. |
| Teshara B. Jones<br>Defense Contract Audit Agency | Jones is an auditor for the Defense Contract Audit Agency since 2008. Jones is anticipated to testify about her review, analysis, and comparison of defendants' financial records and tuna vessel lease information, including sales and expense data from defendants' general ledger, their bank records, and their helicopter lease contracts with tuna vessels. Additionally, Jones will testify that entities/shell corporations owned by defendants received from their helicopter leases with tuna vessels an |

| EXPERT WITNESSES | |
|---|---|
| Name and Company | Summary Testimony |
| | estimated $20 million per year, and an estimated $420 million in total, from 1999-2020. She will also introduce summary charts. |
| Arthur Randall Steffes<br>FAA Special Emphasis Investigations Team | Steffes, among other things, will provide a basic tutorial on aircraft airworthiness and how the FAA required and maintenance procedures, practices and operations relate to aircraft airworthiness with regards to CFR 43 and Part 91 helicopter operations. Steffes will describe the types of inspections and their purposes. He will also describe the types of mechanics' certification and requirements. Steffes also interviewed Randy Rogers who made incriminating statements to him post-interview. He also was present when SEIT inspected Rogers' facility and took photographs. |
| Jeffrey M. Jennings<br>Oklahoma City Flight Standards District Office | Employee with FAA Flight Standards, Supervisory Aviation Safety Inspector. Will testify, among other things, on helicopter flight and operational theory. Will also provide investigative procedures or protocols with respect to FAA and NTSB aircraft accident investigation as required by FAA Order 8020-11 and/or NTSB 830 and 831. He also has experience in the certification of pilots from foreign countries as an FAA Aviation Safety Inspector, is a Part 91 and OH6 expert. |
| John Popecki<br>Mechanic | Popecki is an aircraft mechanic with the Alaska North Slope Borough, Search and Rescue Utqiagvik (Barrow). Popecki will testify to the alterations, modifications, maintenance performed, and documentation required to convert James Marson's N243D from a military OH-6 aircraft to a MD-500 civilian helicopter to achieve FAA airworthiness, based on his personal knowledge of that work. Popecki will render further expert testimony regarding OH-6/369A aircraft technical details, among other things. |

B. Documents.

The government submitted in a separate document a list of exhibits and provided all evidence to defense. The evidence generally falls into the following categories:

• Documents (including emails, spreadsheets, chats, etc.) seized pursuant to 2016 search

United States' Amended Trial Brief

45

warrant
- Documents obtained pursuant to grand jury subpoenas
- Documents obtained pursuant to Inspector General Subpoenas
- Documents obtained from reciprocal discovery
- Documents obtained as part of depositions
- Documents created as part of the criminal investigation
- FAA documents (public)
- NTSB documents (public)
- Evidence Obtained from Civil Aviation Authorities of New Zealand, Philippines, and Federated States of Micronesia via MLAT
- Documents attached to court filings
- Documents referenced in Motions for Judicial Notice

## V.   EVIDENTIARY AND OTHER TRIAL ISSUES

### A.   Authentication

#### 1.   Generally.

A proponent authenticates an exhibit by making a "prima facie showing" that the item is what the proponent claims it is. *See* Fed. R. Evid. 901(a); *United States v. Gadson*, 763 F.3d 1189, 1203-04 (9th Cir. 2014) (party offering evidence discharges its burden under Rule 901 by "mak[ing] a prima facie showing of authenticity 'so that a reasonable juror could find in favor of authenticity or identification.' ") (quoting *United States v. Yin*, 935 F.2d 990, 996 (9th Cir. 1991)); *United States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000) ("The government need only make a prima facie showing of authenticity, as [Rule 901] requires only that the court admit evidence if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.") (quotation marks omitted); *United States v. Black*, 767 F.2d 1334, 1342 (9th Cir. 1985) ("[Rule 901] requires only that the court admit evidence if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification. The credibility or probative force of the evidence offered is, ultimately, an issue for the jury") (quotation marks and citation omitted).

United States' Amended Trial Brief

46

1      The "prima facie showing" test is a "low threshold." *United States v. Ortiz*, 776 F.3d 1042,

2    1044, 1045 (9th Cir. 2015);.*see also United States v. Tin Yat Chin*, 371 F.3d 31, 37-38 (2d Cir.

3    2004) ("Rule 901 does not erect a particularly high hurdle[.] The proponent is not required to rule

4    out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence

5    is what it purports to be. Rule 901's requirements are satisfied if sufficient proof has been

6    introduced so that a reasonable juror could find in favor of authenticity or identification. Once

7    Rule 901's requirements are satisfied, the evidence's persuasive force is left to the jury.") (citations

8    and quotation marks omitted); *United States v. Reilly*, 33 F.3d 1396, 1404 (3d Cir. 1994) ("[T]he

9    burden of proof for authentication is slight[.] [T]he showing of authenticity is not on a par with

10   more technical evidentiary rules, such as hearsay exceptions, governing admissibility. Rather,

11   there need be only a prima facie showing, to the court, of authenticity, not a full argument on

12   admissibility.")

13          2.   Duplicates.

14          Most items of evidence offered will be duplicates. A duplicate is admissible to the same

15   extent as an original unless (1) a genuine question is raised as to the authenticity of the original,

16   or (2) the circumstances make it unfair to admit the duplicate instead of the original. *See* Fed. R.

17   Evid. 1003. The party opposing admission on Rule 1003 grounds has the burden of producing

18   evidence to trigger one of these exceptions. *See, e.g., United States v. Stewart*, 420 F.3d 1007,

19   1021 n.13 (9th Cir. 2005).

20          3.   Foundation for Still Photographs/Video Recording

21          Copies of photographs may be introduced. Under Rule 901 of the Federal Rules of

22   Evidence, a witness familiar with a scene or object may provide a sufficient foundation for

23   admission of a photograph by testifying that it fairly and accurately depicts the scene or the object

24   at the relevant time. *See United States v. Brannon*, 616 F.2d 413, 416 (9th Cir. 1980).

United States' Amended Trial Brief

47

Videotaped evidence is categorized as photographic evidence under Federal Rule of Evidence § 1001(2). The party offering a videotape in evidence must show that it is an accurate and faithful representation of what it purports to show. *Phiropoulous v. State*, 908 S.W. 3d 712, 714 (Mo.App.E.D. 1995). The foundation may be established by any witness who is familiar with the subject matter of the tape and is competent to testify from personal observation. Id." *Suttherland v. Koster*, No. 4:10CV1611MLM, 2011 WL 2784108 (E.D.Mo., 2011).

"Under federal law, a foundational objection to the admission of a videotape is without merit where testimony indicates that the tapes are 'fair and accurate' *United States v. Roach*, 28 F.3d 729, 733 (8th Cir. 1994). Strict compliance with guidelines for admission of videotapes is not required where a videotape's 'substance and circumstances under which it was obtained were sufficient proof of its reliability.' *Id.* at 733 n. 4 (citing *United States v. Clark*, 986 F.2d 65, 68 (4th Cir. 1993)). … Additionally, videotapes are admissible to show how a crime was committed and to link a defendant to a crime. *See e.g.*, *United States v. Standish*, 3 F.3d 1207, 1210 (8th Cir. 1993)." *Suttherland v. Koster*, 2011 WL 2784108 (E.D.Mo., 2011).

4. Evidence Obtained from Civil Aviation Authorities of New Zealand, Philippines, and Federated States of Micronesia via MLAT.

Much like Federal Rule of Evidence 902(11) certifications for domestic business records, 18 U.S.C. § 3505 provides that foreign business records are admissible in criminal proceedings if they are "record[s] kept in the course of regularly conducted business activity" and records are made "at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters." *See United States v. Osorio*, No. 88-5523, 1988 WL 83427, at *1 (4th Cir. July 26, 1988). Section 3505 requires that foreign records can be authenticated through a signed certification. *See* 18 U.S.C. § 3505(a). The documents provided by the Philippine Civil Aviation Authority and the New Zealand Aviation Authority,

United States' Amended Trial Brief

48

satisfy all of the requirements set forth above. Accordingly, the foreign documents are admissible without any need for calling a custodian to provide live testimony to authenticate the documents. *See United States v. Strickland*, 935 F.2d 822, 831 (7th Cir. 1991) (admitting records and noting Congressional intent to "streamline" admission of foreign business records by substituting § 3505 certification for "the cumbersome and expensive procedures' of live-witness testimony under Rule 803(6)"); *United States v. Al-Imam*, No. 17-cr-00213 (CRC), 2019 WL 2358365, at *4 (D.D.C. June 4, 2019).

      B.  <u>Evidence "Inextricably Intertwined" With the Scheme to Defraud.</u>

      The United States will seek to introduce evidence that (1) the defendants similarly bribed, lied to, and defrauded other civil aviation authorities around the world; and (2) failed to report income derived from the scheme to defraud. While such evidence generally is not admissible to prove the character of a person in order to show action in conformity therewith, *see* Fed. R. Evid. 404(b), the government is *not* offering this evidence under Rule 404(b). Rather, the uncharged conduct is "inextricably intertwined" with defendant's execution of the ongoing scheme that is charged in the indictment with specificity.

      It is well settled in the Ninth Circuit that Rule 404(b) does not exclude evidence of uncharged conduct that is inextricably intertwined with the charged offenses. *United States v. Sayakhom*, 186 F.3d 928, 938 (9th Cir. 1999). "Evidence should not be treated as 'other crimes' evidence 'when the evidence concerning the [other] act and the evidence concerning the crime charged are inextricably intertwined.'" *United States v. Soliman*, 813 F.2d 277, 279 (9th Cir. 1987) (citing *United States v. Aleman*, 592 F.2d 881, 885 (5th Cir. 1979)); *see also United States v. Ripinsky*, 129 F.3d 518, 1440 (9th Cir. 1997) (uncharged crimes were "direct evidence of the ongoing conspiracy charged in the indictment"); *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995) ("[W]hen it is clear that particular acts of the defendant are part of, and thus

United States' Amended Trial Brief

49

inextricably intertwined with, a single criminal transaction," admission of evidence of those acts does not violate Rule 404(b)).

    C. <u>Defendants' Own Statements.</u>

        1. <u>Admissions of a Defendant are Admissible When Offered by the Government but Defendants Cannot Introduce Their Own Hearsay Statements.</u>

The United States will introduce defendants' own statements, including statements made in recorded telephone calls, email messages, and/or chat transcripts, including a number of the examples referenced throughout this brief. Fed. R. Evid. 801(d)(2)(A) provides that a party's own statement is directly admissible against the party. *United States v. Matlock*, 415 U.S. 164, 172 (1974) (A party's "own out-of-court admissions . . . surmount all objections based on the hearsay rule . . . and [are] admissible for whatever inferences the trial judge [can] reasonably draw.").

The government will offer statements made by defendants into evidence. Fed. R. Evid. 801(d)(2)(A). Under Rule 801(d)(2)(A), a party-opponent's own statements are admissible against that party-opponent as non-hearsay. Although the government may offer a statement into evidence against a defendant as an admission, the defendant cannot offer his prior statements on his own behalf for proof of the truth of the matter asserted since these self-serving statements are hearsay if not offered against a party opponent. *See United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) (defendant could not introduce non-self-inculpatory statements because they were inadmissible hearsay). Nor can defendants seek to introduce such hearsay statements through cross-examination of other witnesses. *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988).

        2. <u>*Bruton* Does Not Bar Introduction of Defendants' Statements.</u>

As set forth in previous filings (ECF Nos. 670, 891, 976, 1132, 1157 and 1196), the United States submits that statements made by defendants Rogers (severed) and Reed (severed) to federal

United States' Amended Trial Brief

50

investigators are not powerfully or facially incriminating, standing alone, and are therefore not subject to *Bruton v. United States*, 391 U.S. 123 (1968). To the extent the Court disagrees, the Government can readily redact the purportedly offending statements in a way that "[does] not lead to the inference that a specific person was named." *United States v. Peterson*, 140 F.3d 819, 822 (9th Cir. 1998).

    D.  <u>Summary Exhibits.</u>

       The government will seek to introduce summary exhibits into evidence under Rule 1006 of the Federal Rules of Evidence. Rule 1006 provides that "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. The proponent of summary evidence needs to "establish that the underlying materials upon which the summary is based (1) are admissible in evidence and (2) were made available to the opposing party for inspection." *United States v. Rizk*, 660 F.3d 1125, 1130 (9th Cir. 2011). Summary evidence admitted under Rule 1006 is not only demonstrative, but also substantive. *See United States v. Woods*, 943 F.2d 1048, 1053-54 (9th Cir. 1991) (stating that "[c]harts and summaries as evidence are governed by Federal Rule of Evidence 1006" and upholding the admission of the government's summary charts in a tax evasion case).

       The Ninth Circuit generally prefers that trial courts not admit both summary evidence and voluminous materials underlying them, but has acknowledged a district court's authority to exercise its "discretion under [Federal Rule of Evidence] 611(a) to admit summary exhibits for the purpose of assisting the jury in evaluating voluminous evidence." *See United States v. Anekwu*, 695 F.3d 967, 981 (9th Cir. 2012). Indeed, courts regularly admit such summary exhibits in cases involving large quantities of financial information like this one. *See United States v. Aubrey*, 800 F.3d 1115, 1130 (9th Cir. 2015) (admitting summary charts where the witness based them on

United States' Amended Trial Brief

"multiple banker's boxes of bank statement [, which] constitute[d] the type of material anticipated by Rule 1006").

In this case, the government seeks to admit the following summary exhibits as substantive evidence, along with the underlying voluminous evidence, if necessary: 1) FAA registration, ownership, and other information regarding defendant helicopters; 2) foreign aviation information; 3) deposits and other financial transactions as evidenced in defendants' bank and QuickBooks records; 4) accidents involving defendants' helicopters both before and after defendants' purchase of them; and 5) certification information regarding defendants' airmen.

These summary exhibits not only summarize the voluminous records and documents—all of them relevant and admissible—but also categorize and synthesize the relevant evidence to assist the jury in evaluating voluminous evidence. Without them, the jury would be left to sift through and compare thousands of pages of different types of documents before it can adequately isolate, categorize, and focus on the evidence central to the issues in question. Admitting these summary exhibits will foster efficient jury deliberation and help avoid wasting time in the presentation of the evidence. *See* Fed. R. Evid. 611(a). All have been provided to defense, some as long ago as August of 2020.  To date, none of the defendants has objected.

E.  Incriminating Evidence Outside the Statute of Limitations.

The statute of limitations for wire fraud is five years. 18 U.S.C. § 3238. Defendants were first indicted on May 31, 2018. Criminal acts constituting wire fraud committed by the defendants before May 31, 2013 thus fall outside the statute of limitations. Accordingly, the government did not charge the defendants with immigration fraud, tax fraud, wire fraud, false statements, and other available criminal statutes that had occurred before the date.

This does not prevent the government from introducing evidence of incriminating acts committed by the defendants prior to May 31, 2013. It is well established that "the statute of

United States' Amended Trial Brief

52

limitations does not bar the introduction of evidence of acts that occurred outside the limitations period." *United States v. Musacchio*, 968 F.2d 782, 790 (9th Cir. 1991). The statute of limitations is "a procedural rule that requires the bringing of a complaint within a certain time after the completion of a crime," and not "a rule that restricts the introduction of evidence." *Id.* at 790.

As noted above, as early as 1992 and continuing through the present, the defendants engaged in a comprehensive scheme to defraud the government, the public, and their clients as to the safety and regulatory compliance of their helicopters. Indeed, the defendants' acts during the period show the genesis of the overarching fraud scheme and the absence of mistake and consciousness of guilt. As such, evidence from this entire time period is direct evidence of the existence of a fraud scheme and the intent to defraud, evidence that is relevant and admissible as to the elements of wire fraud and other charges, regardless of the statute of limitations.

F. Prior Rulings on Motions in *Limine.*

The Court has ruled on a number of Motions in *Limine*, but not all of them to date. The government incorporates by reference those rulings, and future rulings.

G. Presentation of Evidence.

In the interest of judicial economy and efficiency, the Court can set the order of witness examination and presentation. Fed. R. Crim. P. 611(a). The government requests the Court require defense to question any government witness it intends to call in its case-in-chief following the government's re-direct examination of that witness. This presentation and examination of witnesses will avoid wasting the Court and the witnesses' time, many of whom are travelling from the United States and other parts of the world at the government's substantial cost.

H. Spousal and Marital Privileges.

The government has served Mary Rogers, wife of Rogers, and Juliet Crowe, wife of Crowe, with trial subpoenas concerning their roles in their husbands' businesses. Federal Rule of Evidence

United States' Amended Trial Brief

53

501, provides that the common law – "as interpreted by the courts of the United States in the light of reason and experience" – governs a claim of privilege. Fed. R. Evid. 501; *United States v. Griffin*, 440 F.3d 1138, 1143–44 (9th Cir. 2006). The common law recognizes two separate privileges arising out of the marital relationship: (1) the anti-marital facts privilege, and (2) the marital communications privilege. *United States v. Marashi*, 913 F.2d 724, 729 (9th Cir. 1990).

The anti-marital facts privilege, also called the "adverse spousal testimony" privilege, permits a witness to refuse to testify against her or her spouse. *Griffin,* 440 F.3d at 1143; *see also Trammel v. United States*, 445 U.S. 40, 53 (1980). The witness-spouse alone holds the privilege and may choose to waive it. *Unites States v. Vo*, 413 F.3d 1010, 1016 (9th Cir. 2005). Thus, if these spouses choose to testify against Rogers and Crowe, they cannot prevent her from doing so.

The marital communications privilege "bars testimony concerning statements privately communicated between spouses." *Marashi,* 913 F.2d at 729. The marital communications privilege "protects from disclosure private communications between spouses," *Griffin*, 440 F.3d at 1143–44 (citations omitted), and may be invoked by the non-testifying spouse. *Marashi*, 913 F.2d 729. However, because the marital communications privilege "obstructs the truth seeking process," its use "in criminal proceedings requires a particularly narrow construction because of society's strong interest in the administration of justice." *United States v. White*, 974 F.2d 1135, 1138 (9th Cir. 1992) (citations omitted).

The marital communications privilege is limited to: (1) "only ... words or acts intended as communication to the other spouse," (2) "only those communications made during a valid marriage," and (3) "only ... those marital communications which are confidential." *Griffin*, 440 F.3d at 1143–44. This privileges bars testimony concerning intra-spousal, confidential expressions arising from the marital relationship. *United States v. Bolzer*, 556 F.2d 948, 951 (9th Cir. 1977). Communications made in the presence of third persons or intended to be disclosed to others are

United States' Amended Trial Brief

54

outside the privilege. *United States v. Strobehn*, 421 F.3d 1017, 1021 (9th Cir. 2005). In addition, this privilege does not shield marital confidences when those confidences concern joint criminal activity. *Vo*, 413 F.3d at 1017; *Marashi,* 913 F.2d at 731 (the policies underlying marital communications privilege "pale in the face of public concerns about bringing criminals to justice").

Here, the testimony sought from Mary Rogers and Juliet Crowe concern their role in Rogers' and Crowe's businesses, and their preparation of documents, invoices, and other paperwork on behalf of the companies. This testimony does not necessarily concern any communications between spouses, but, if so, such communications would not be privileged anyway under a theory of joint criminal activity.

I.    International Law Governs Helicopters Operating Over the "High Seas."

Defendants made the incorrect and misleading argument numerous times that an aircraft operating on the high seas is free from *any* obligation to be registered or overseen by any national authority under international law; in other words, that defendants' helicopters could operate in a way "that would be considered piracy." *See* ECF No. 792 (08/17/20 Hr'g Tr.) 13–14:24–3, 21:9–11, 22:4–9, 23:1–4; 24:22–23; ECF No. 450 at 20-21. This argument is incorrect and unsupported under international law, and must be excluded.

First, even assuming defendants' aircraft are aerial work helicopters, aerial work helicopters are subject to the International Civil Aviation Organization (ICAO) Convention on Civil Aviation ("Chicago Convention"). While it is true that *one* part of this comprehensive scheme covers helicopters in international commercial air transport or international general aviation operations, international aviation law is contained in numerous other parts of the Chicago Convention itself and the rest of the ICAO Annexes; and those laws *do* apply to defendants' aircraft.

United States' Amended Trial Brief

55

In particular, Article 3 of the Chicago Convention states that "[t]his Convention shall be applicable…to civil *aircraft*," (emphasis added), and "aircraft" is defined as "[a]ny machine that can derive support in the atmosphere from the reactions of the air other than the reactions of the air against the earth's surface," ICAO Annex 7, Classification of Aircraft. In other words, these rules apply to machines that fit the definition of aircraft, of which defendants' helicopters are included.

Second, aircraft operating on the high seas are subject to registration and oversight requirements under international aviation law. The Chicago Convention and ICAO Annexes established the international flight requirements that govern civil aircraft. Every country in the world—with the exception of Lichtenstein—is a member of ICAO. ICAO has promulgated Rules of the Air to which all member states must abide, and "[o]ver the high seas . . . these rules apply *without exception.*" ICAO Annex 2 (Emphasis added). These rules implement the following relevant Articles of the Chicago Convention:

- Article 12, Rules of the Air (requiring each contracting State to adopt measures to insure that every aircraft flying over or maneuvering within its territory and that every aircraft carrying its nationality mark, wherever such aircraft may be, shall comply with the rules and regulations relating to the flight and maneuver of aircraft there in force).

- Article 17, Nationality of Aircraft (requiring that "[a]ircraft have the nationality of the State in which they are registered").

- Article 20, Display of Marks (requiring that "[e]very aircraft engaged in international air navigation shall bear its appropriate nationality and registration marks.").

- Article 29, Documents Carried in Aircraft (requiring that "[e]very aircraft of a contracting State, engaged in international navigation, shall carry" its certificate of registration, its certificate of airworthiness, and the appropriate licenses for each member of the crew).

- Article 31, Certificates of Airworthiness (requiring that "[e]very aircraft engaged in international navigation shall be provided with a certificate of airworthiness issued or rendered valid by the State in which it is registered.").

United States' Amended Trial Brief

56

- Article 32, Licenses of Personnel (requiring that "The pilot of every aircraft and the other members of the operating crew of every aircraft engaged in international navigation shall be provided with certificates of competency and licenses issued or rendered valid by the State in which the aircraft is registered.").

Likewise, the Annexes to the Chicago Convention contain important clarifications on what law applies to aircraft operating on the high seas. As noted above, Annex 2 states that "[o]ver the high seas . . . the[] rules [of the CC] apply *without exception*" (emphasis added). Additionally, Annex 2 provides ICAOs definition for the "Appropriate Authority" regarding an aircraft's "flight over the high seas: The relevant authority of the State of Registry.".

Thus, reading the Articles and Annexes together leads to two conclusions that directly rebut the defendants' argument that they are exempt from registration and certification. First, the high seas are not a 'law-free' zone. Article 12 and Annex 2 unambiguously state that the Chicago Convention and the ICAO Annexes apply to aircraft operating on the high seas. ***To argue otherwise flies in the face of the plain language of these treaties.*** Second, air flight over the high seas requires registration and oversight by the applicable civil aviation authority – here, the FAA[10]. Articles 17 and 20 confirm that every aircraft must have a nationality and display marks of such nationality and registration, while Articles 29 and 31 through 33 describe how all aircraft must have valid certificates of registration and airworthiness. Further, Annex 2 makes clear that even over the high seas an aircraft is still under the authority of the State that issued its certificate of registration. Thus, despite defendants' claims to the contrary, international aviation law applies to aircraft operating on the high seas, and requires valid registration and oversight of such aircraft regardless of where they are operating.

//

---

[10] It must be remembered that the defendants sought registration and re-registration with the FAA over 300 times due to the benefits of that registration.

United States' Amended Trial Brief

1    J.   Statements of Non-Testifying Agents

2         During trial, agents may testify about other agents' surveillance. Such testimony is

3    admissible under the present-sense-impression exception of Rule 803(1) of the Federal Rules of

4    Evidence. *See, e.g.*, *United States v. Gil*, 58 F.3d 1414, 1422 (9th Cir. 1995) (testimony of agents

5    who overheard observations of surveillance officers "easily satisfy the requirements" of Rule

6    803(1), as "[t]he surveillance officers were providing a description of the events at the same time

7    they were witnessing them, so the testimony was admissible under the present sense impression

8    exception[.]"). This case-law survives *Crawford v. Washington,* 541 U.S. 36 (2004). *See United*

9    *States v. Solorio*, 669 F.3d 943, 952-54 (9th Cir. 2012).

10        K.   Unrelated Instances of Non-Criminal Conduct

11        Evidence that defendant obeyed laws or otherwise comported himself well on other

12   occasions is inadmissible because it is not probative of whether he committed the crime charged

13   in this case. *See, e.g.*, *United States v. Qaoud*, 777 F.2d 1105, 1111 (6th Cir. 1985) (affirming

14   exclusion of evidence that defendants did not take bribes on certain occasions was inadmissible

15   as irrelevant to whether they did take bribes on others); *United States v. Russell*, 703 F.2d 1243,

16   1249 (11th Cir. 1983) (affirming exclusion of evidence of specific, unrelated "good acts" as

17   irrelevant to guilt); *United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978) ("Evidence of

18   noncriminal conduct to negate the inference of criminal conduct is generally irrelevant."").

19   Evidence of a "lack of prior bad acts" amounts to inadmissible character evidence under Rule

20   405(a), which prohibits evidence of specific instances of conduct to prove character. *See United*

21   *States v. Barry*, 814 F.2d 1400, 1403 (9th Cir. 1987); *See also United States v. Hedgcorth*, 873

22   F.2d 1307, 1313 (9th Cir. 1989) (same).

23        L.   Explanation of Investigation

24        An out-of-court statement is not hearsay when offered not for the truth but to explain how an

United States' Amended Trial Brief

58

investigation unfolded. *See United States v. Tenerelli*, 614 F.3d 764, 772 (8th Cir. 2010); *United States v. Cromer*, 389 F.3d 662, 676 (6th Cir. 2004); *United States v. Barela*, 973 F.2d 852, 855 (10th Cir. 1992); *United States v. Martin*, 897 F.2d 1368, 1371-72 (6th Cir. 1990); *United States v. Lowe*, 767 F.2d 1052, 1063-64 (4th Cir. 1985).

## VI. CONCLUSION

The foregoing is a summary of points the government anticipates may arise at trial. Should any legal issues arise that have not been covered in this amended trial brief, the government respectfully requests leave to submit such further memoranda as may be necessary.

RESPECTFULLY SUBMITTED this 4th day of February, 2022.

SHAWN N. ANDERSON
United States Attorney
Districts of Guam and NMI

By:     */s/ Stephen F. Leon Guerrero*
STEPHEN F. LEON GUERRERO
Assistant U.S. Attorney

*/s/ Marie L. Miller*
MARIE L. MILLER
Special Assistant U.S. Attorney

*/s/ Samantha R. Miller*
SAMANTHA R. MILLER
Special Assistant U.S. Attorney

United States' Amended Trial Brief

59